**VIRGINIA POWER ENERGY MAR-KETING, INC. and Dominion Re-sources, Inc., Appellants**

v.

**APACHE CORPORATION, Appellee.**

No. 14–07–00787–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 6, 2009.

Hancy Hahn Elliott, Eugene M. Nettles, Christopher W. Barnes, Houston, TX, Deborah G. Hankinson, Dallas, TX, J. Kevin Watson, Jackson, MS, for Appellants.

Roger D. Townsend, Katherine D. Mackillop, Thomas W. Peterson, Houston, TX, for Appellees.

Panel consists of Justices YATES, GUZMAN, and SULLIVAN.

## OPINION

KENT C. SULLIVAN, Justice.

This business dispute involves the application and effect of *force majeure* provisions in a natural-gas supply contract between the seller, Apache Corporation, and Virginia Power Energy Marketing, Inc. ("VPEM"), the purchaser. The parties agreed that Apache was to deliver natural gas to VPEM at two specific locations in September and October of 2005. However, during that time period, Hurricanes Katrina and Rita struck the Gulf Coast, damaging gas-production platforms and portions of the natural-gas pipelines. After Apache failed to deliver the agreed-upon quantity of natural gas at either location, a lawsuit ensued. The trial court ruled, by summary judgment, that Apache's performance was excused under the *force majeure* provisions of the parties' agreement.

Appellants, which consist of VPEM and its parent company, Dominion Resources, have appealed the summary judgment and raise two arguments. First, they contend that, although the hurricanes prevented Apache from delivering gas to one of the two agreed-upon locations, a "reasonable

efforts" clause in the contract required Apache to make alternate delivery arrangements. We affirm that portion of the summary judgment. Second, as to the other delivery location, which was undamaged, appellants claim that Apache had an available gas supply to satisfy VPEM's contract needs. We conclude that a fact issue exists; therefore, we reverse that portion of the summary judgment, and remand the dispute to the trial court.

## BACKGROUND

In 2003, Apache and VPEM reached agreement on the basic terms that would govern a series of natural-gas sales from Apache, a producer, to VPEM, an energy marketer. Those general terms are contained in a "Base Contract," a form contract that was originally prepared by the North American Energy Standards Board ("NAESB") but whose terms can be altered according to the contracting parties' particular needs. The Base Contract contains only the basic provisions that apply to any subsequent natural-gas sales between the parties, and does not recite details for any specific transaction. Instead, the details of each subsequent sale were to be memorialized in written "Transaction Confirmations" (the "Confirmations").

Thus, the parties' entire agreement is governed by both the general Base Contract and the more specific Confirmation that would include the sales terms as to each individual transaction.[1] Generally, the parties agreed that Apache would bear the sole responsibility for transporting the contract amount of natural gas, according to each Confirmation, to a designated "Delivery Point" where it would be received by VPEM.

■ In August 2005, the parties executed three Confirmations reflecting Apache's commitment to sell and deliver, and VPEM's obligation to pay for, natural gas during September and October 2005. The relevant terms of these commitments were as follows:

(1) In September 2005, Apache was to deliver 300,000 MMBtu[2] of natural gas to VPEM along the Tennessee Gas Pipeline to a Delivery Point identified as the Zone L Leg 500 Pooling Area ("Tennessee L–500");

(2) In October 2005, Apache would deliver an additional 310,000 MMBtu to VPEM at the same Tennessee L–500 Delivery Point; and

(3) In October 2005, Apache would also deliver 310,000 MMBtu to VPEM at Station 65, a Delivery Point along the Transcontinental Pipeline ("Transco–65").

All three commitments were designated as "firm" transactions which, according to the Base Contract, meant that either party could interrupt performance without liability "only to the extent that such performance is prevented for reasons of *Force Majeure.*"[3] Relevant to this case, the Base Contract specifically mentioned "hurricanes" as a possible *force majeure* event.

---

1. The parties agree that each Confirmation represents a separate contract transaction, although all such sales are governed by the same general terms from the Basic Contract.

2. According to the Base Contract, one "MMBtu" represents one million British thermal units, and equates to one "dekatherm" of natural gas.

3. (Italics added). Generally speaking, the term *"force majeure"* refers to an event, such as an "Act of God," beyond the parties' reasonable control that intervenes to create a contractual impossibility and thereby excuse contract performance. *See Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1248 n. 5 (5th Cir.1990); BLACK'S LAW DICTIONARY 645 (6th ed. 1990).

On August 27, 2005, the approach of Hurricane Katrina to the Gulf Coast prompted Apache to evacuate numerous offshore platforms and onshore production facilities. In the next few days, Apache invoked the *force majeure* provisions in the Base Contract and notified VPEM that the September delivery to Tennessee L–500 would be curtailed. As it turned out, the hurricane caused significant damage to portions of the Tennessee Gas Pipeline that precluded the delivery of gas to the L–500 pooling area, the agreed destination point for VPEM's September gas. VPEM asked Apache to deliver to an alternate location, but Apache declined. Thus, VPEM received only 15,588 MMBtu of the contract quantity of 300,000 MMBtu that was to be delivered to Tennessee L–500.

The following month, Apache once again evacuated its offshore platforms in preparation for Hurricane Rita. Again invoking the Base Contract's *force majeure* provisions, Apache notified VPEM that its October deliveries to both Delivery Points, Tennessee L–500 and Transco–65, would be suspended or curtailed. Accordingly, VPEM received 149,781 MMBtu at Transco–65, but only 38,727 MMBtu at Tennessee L–500, which remained damaged after the second hurricane.

To cover the shortfall between the contracted-for amounts and that actually delivered by Apache, VPEM purchased additional gas on the Intercontinental Exchange "spot market,"[4] at $2.25 million more than it would have paid under its contract with Apache. However, after completing the anonymous spot-market purchases made necessary following Apache's *force majeure* declaration, VPEM discovered that the seller in several of those spot-market transactions was, in fact, Apache.

Concluding that Apache had improperly invoked *force majeure* to sell natural gas on the spot market at higher prices, VPEM offset $2.25 million from its other payments to Apache. Apache demanded payment of the offset amount from Dominion Resources, VPEM's parent company that had guaranteed prompt and complete payment of VPEM's "due but unpaid obligations."

After Dominion failed to pay the demanded amount, Apache sued VPEM and Dominion for breach of contract. VPEM counterclaimed, alleging that Apache breached the Base Contract by improperly invoking *force majeure* and refusing to deliver the contract amount of natural gas. Apache moved for partial summary judgment on its contract claims against VPEM and Dominion, arguing that its own performance was excused under the Base Contract's *force majeure* provisions but that appellants breached the contract by paying less than the full amounts due to Apache. The trial court granted Apache's motion for partial summary judgment, which became final after the parties stipulated to all remaining issues.

Here, appellants contend Apache was not entitled to summary judgment, for two reasons. First, they contend that a "reasonable efforts" provision in the Base Contract obligated Apache to provide the Tennessee L–500 gas at a different delivery location. Second, they argue that Apache failed to conclusively establish that the hurricanes prevented performance at the Transco–65 location.[5]

---

4. In its brief, VPEM describes the Intercontinental Exchange as "an electronic exchange that matches sellers having available gas with buyers in need of supply." Generally, a "spot market" refers to a commodity market in which goods can be sold for cash for immediate delivery. *See* BLACK'S LAW DICTIONARY 1402 (6th ed. 1990).

5. Appellants also claim that Apache violated the Base Contract by engaging in profiteering,

## ANALYSIS

■ The scope and effect of a *"force majeure"* clause depends on the specific contract language, and not on any traditional definition of the term. *See Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc.,* 157 S.W.3d 462, 466 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1248 n. 5 (5th Cir.1990). Thus, in this contract dispute that ended by summary judgment, we begin with a brief discussion of the principles that govern our review of the summary judgment and interpretation of the contract.

### A. Standard of Review

To be entitled to summary judgment, Apache, the plaintiff, was required to conclusively establish all of the elements of its cause of action as a matter of law. *See Brown v. Blum,* 9 S.W.3d 840, 845 (Tex. App.-Houston [14th Dist.] 1999, pet. dism'd w.o.j.). We must examine the entire record in the light most favorable to the non-movant, indulging reasonable inferences and resolving doubts against the moving party. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). If the motion and summary-judgment evidence establish the movant's right to judgment as a matter of law, the burden shifts to the non-movant to raise a genuine, material fact issue to defeat summary judgment. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). Evidence will raise a genuine fact issue if, after considering it, reasonable and fair-minded jurors could differ in their conclu-

sions. *See Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007). If, as here, the trial court specifically states the basis on which it granted the motion for summary judgment, we must consider those grounds. *See Zurich,* 157 S.W.3d at 464–65. In addition, in the interest of judicial economy, we may also consider other grounds that the trial court did not expressly address. *See id.*

■ The party seeking to excuse its performance under a contractual *force majeure* clause, here, Apache, bears the burden of proof to establish that defense. *See Moore v. Jet Stream Invs., Ltd.,* 261 S.W.3d 412, 420 (Tex.App.-Texarkana 2008, pet. denied). As we interpret the parties' contract, including the *force majeure* provisions, our primary concern is to determine the parties' intent. *See Zurich,* 157 S.W.3d at 465. We must examine the contract as a whole to harmonize and effectuate all of its provisions so that none are rendered meaningless. *Id.* We look at how a reasonable person would have used and understood the language, by considering the circumstances surrounding the contract negotiations and purposes the parties intended to accomplish by entering into the contract. *Cook Composites, Inc. v. Westlake Styrene Corp.,* 15 S.W.3d 124, 132 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd).

### B. The Contract's Force Majeure Provisions

The relevant *force majeure* portions of the Base Contract provide as follows:

---

that is, invoking *force majeure* so as to sell gas at a higher price than the contract price. They point to a clause which states only that *force majeure* does *not* include a party's economic hardship, such as its "ability to sell Gas at a higher or more advantageous price than the Contract Price." However, Apache did not invoke "economic hardship" to justify its nonperformance; instead, it contended that the hurricanes rendered performance impossible which, if true, would be an appropriate reason under the Base Contract to excuse its nonperformance. Therefore, to resolve this appeal, we need not address this argument.

11.1. [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by *Force Majeure*. The term *"Force Majeure"* as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2. 11.2. *Force Majeure* shall include, but not be limited to ... physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe.... Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and to resolve the event or occurrence once it has occurred in order to resume performance. 11.3. Neither party shall be entitled to the benefit of the provisions of *Force Majeure* to the extent performance is affected by ... the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.[6]

The Base Contract further defines the word "Firm," as used in section 11.1, to mean "that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of *Force Majeure* [.]"[7] However, the Base Contract does not define the terms "reasonable efforts," from section 11.2, or "gas supply," as found in section 11.3.

### C. *Delivery to Alternate Locations*

▪ Regarding the Tennessee L–500 commitments, VPEM concedes that the hurricanes caused damage to the Tennessee Gas Pipeline that prevented Apache from making delivery at the agreed-upon Delivery Point. Nevertheless, VPEM contends that, under the "reasonable efforts" clause in section 11.2 of the Base Contract, Apache was required to perform at an alternate Delivery Point along the pipeline. We disagree, because such an interpretation conflicts with the parties' express agreement and would frustrate their intent to excuse non-performance caused by a *force majeure* event.

That is, the parties expressly agreed that Apache was to deliver 610,000 MMBtu of natural gas to a *specific* Delivery Point: the Tennessee L–500 pooling area. The parties also agreed, through the Base Contract, to relieve Apache from performing if a *force majeure* event were to prevent delivery. However, both of these contract provisions would be rendered meaningless under VPEM's interpretation of the "reasonable efforts" clause, which would force Apache to deliver gas, notwithstanding an acknowledged *force majeure* event, to a location other than that to which the parties expressly agreed. *See Tex. Workers' Comp. Ins. Facility v. State Bd. of Ins.,* 894 S.W.2d 49, 54 (Tex.App.-Austin 1995, no writ) ("[O]ne party cannot unilaterally modify the terms of the original contract.").

▪ We must presume that the parties intended each contract provision to have effect. *See Phoenix Holdings, Ltd. v. Circle C Land Corp.,* 987 S.W.2d 933, 937 (Tex.App.-Austin 1999, pet. denied) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)). Therefore, we may not construe one clause in a manner that renders other provisions meaningless. *See Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.

---

6. Italics added.

7. Italics added.

2004). Nor may we rewrite the parties' contract under the guise of interpretation. *See Gen. Am. Indem. Co. v. Pepper*, 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 815 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). Thus, we may not construe the "reasonable efforts" clause as requiring Apache to agree to VPEM's demands to alter the express terms of their contract. *See Pepper*, 339 S.W.2d at 661; *see also Werline v. E. Tex. Salt Water Disposal Co.*, 209 S.W.3d 888, 901 (Tex.App.-Texarkana 2006, pet. granted) (declining to interpret "reasonable policies" provision to vary explicit language in contract).

Arguing that "reasonable efforts" includes alternate delivery, VPEM notes that, during the same time frame, Apache agreed to different delivery arrangements with another purchaser, the Municipal Gas Authority of Georgia ("MGAG"). However, that argument is not persuasive because Apache's contract with MGAG is different in several respects.[8] Significantly, it contains a provision expressly *obligating* both parties to agree to alternate delivery locations upon reasonable request: "Delivery Points may, subject to the consent of the other party, be redesignated from time-to-time, in writing, by either Seller or Purchaser, provided that such consent shall not be unreasonably withheld." By contrast, Apache's contract with VPEM does not include a similar provision. Therefore, we cannot conclude that the parties intended that the "reasonable efforts" clause would trump their express agreement concerning delivery locations.

■ Alternatively, VPEM contends that Apache was required to make alternate delivery under Uniform Commercial Code section 2–614, which provides: "Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted." Tex. Bus. & Comm.Code Ann. § 2.614(a) (Vernon 2009).[9]

However, like several other provisions of Article 2 of the UCC, section 2.614 is a "gap-filler" provision that applies only in the absence of the parties' specific agreement. *See id.* § 1.302(a) (Vernon 2009) ("[T]he effect of provisions of this title may be varied by agreement."); *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex.1996); *Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 304–05 (Tex.App.-Houston [1st Dist.] 2009, no pet.). In this case, the parties reached a specific agreement under which Apache would be relieved from making delivery if a *force majeure* event, like a hurricane, prevented performance because of "breakage or accident or necessity of repairs to ... lines of pipe." Therefore, section 2.614 cannot vary the terms of the parties' express agreement. *See Lenape Res. Corp.*, 925 S.W.2d at 570.

---

8. Apache's Base Contract with VPEM is twelve pages long. By contrast, Apache's entire agreement with MGAG is almost ten times that size, occupying 117 pages in the appellate record. Notably, the MGAG agreement is not based upon, and contains numerous provisions that are absent from, the NAESB form contract, including a clause expressly providing for alternate delivery arrangements.

9. Section 2.614 of the Business and Commerce Code is identical to UCC section 2–614. *See* Tex. Bus. & Comm.Code Ann. § 2.614 historical note (Vernon 2009) [Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 1 sec. 2.614, 1967 Tex. Gen. Laws 2343, 2393].

Here, two hurricanes combined to cause enough damage to the Tennessee Gas Pipeline that Apache could not perform at the agreed-upon L–500 Delivery Point. Therefore, that aspect of Apache's contract performance was excused under *force majeure*. Accordingly, we hold that the trial court properly granted summary judgment on that basis.

### D. Loss or Failure of Apache's "Gas Supply" Preventing Performance

Although delivery was impossible at Tennessee L–500 because of damage to that pipeline, deliveries did occur at the other Delivery Point, Transco–65. Nevertheless, Apache delivered only half of its October commitment to VPEM at that location. To explain the shortfall, Apache again invoked *force majeure*, claiming that the hurricanes caused a "loss or failure of [its] gas supply," as contemplated by sections 11.2 and 11.3. However, under the Base Contract, a "loss or failure of Seller's gas supply" does not constitute *force majeure* unless such loss was caused by a qualifying event that prevented the seller from performing.

VPEM concedes that the hurricanes were a *force majeure* event, under section 11.2. Thus, the outcome of this issue turns upon the question of whether Apache conclusively established, through summary judgment, that it suffered a loss or failure of its "gas supply" that prevented delivery of the full contract amount of gas to Transco–65. Central to this inquiry is the meaning of the contract term "gas supply," which is not defined in either the Base Contract or subsequent Confirmations.

### 1. The Parties' Proposed Definitions of "Gas Supply"

Apache's proposed definition of "gas supply" reflects its apparent plan, on some internal level, to fill VPEM's commitment needs at Transco–65 from a few specific oil and gas platforms located in south and southeastern Louisiana. In line with this intent, Apache advances a narrow definition of "gas supply" that includes only those specific platforms, which Apache characterizes as its "equity production" that was native to, or tied into, Transco–65. By contrast, VPEM urges a broader reading of the term "gas supply" that would encompass Apache's uncommitted gas from "the same geographic region" that could have been used to meet its commitment to VPEM.

In determining the parties' intent, we must assign terms their plain, ordinary, and generally accepted meaning unless the contract indicates that the parties used them in a technical or different sense. *See Zurich*, 157 S.W.3d at 465; *see also Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 330 (Tex.1984) (requiring courts to construe a contract in a manner that gives effect to the parties' intentions as revealed by the language used in the contract). Even so, however, we may consider extrinsic evidence, such as expert testimony or reference material, to determine whether a contract term enjoys a commonly understood meaning in the industry. *See XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627–28 (Tex.App.-Houston [14th Dist.] 2006, pet. denied); *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n. 6 (Tex.1995)).

Apache argues that, in the oil and gas industry, it is common practice for a supplier to internally decide on a specific supply source that will be used to satisfy a particular customer's commitments. Apache therefore concludes that, within the industry, the term "gas supply" is com-

monly understood to refer only to those sources *internally designated by the seller.* Apache presents no expert testimony, and points to no reference materials, buttressing that claim. By contrast, VPEM contends that, if a seller wishes to limit its "supply" to a specific source, it must expressly state that intent in the contract. In support, VPEM offered the expert testimony of James H. Buccigross, who opined:

> Apache's source of supply is not stated in the Base Contract or the Transaction Confirmations. Other producers and sellers of natural gas often choose to specify the production point or wellhead on their contracts or Transaction Confirmations. Apache did not. If Apache and VPEM wanted to "path" the gas from specific wellhead(s) to delivery points then that information should have been in the contract, or at least the Transaction Confirmations, and it was not.

Thus, on the record presented, we cannot conclude that Apache's proposed definition of "gas supply" is so common and universal in the industry that the parties can be said to have contracted with that understanding in mind. *See Energen Res. MAQ, Inc. v. Dalbosco,* 23 S.W.3d 551, 556 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (citing *Barreda v. Milmo Nat'l Bank,* 252 S.W. 1038, 1039–40 (Tex. Comm'n App.1923, judgm't adopted); *State Nat'l Bank of Houston v. Woodfin,* 146 S.W.2d 284, 286 (Tex.Civ.App.-Galveston 1940, writ ref'd)). As the *Woodfin* Court noted:

> It has been uniformly held in this State that a custom, in order to constitute an element of contract, must be either shown to have been known personally to the parties to the contract, or

to have been so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

*Woodfin,* 146 S.W.2d at 286; *see also Barreda,* 252 S.W. at 1039–40 ("The general rule in the case of contract is that the custom and usage must be so general that both are presumed to be aware of them, or that they have actual knowledge of them, to be charged with having contracted with reference to such usage and custom."). Apache has failed to make that necessary showing.

Instead, the record indicates, and Apache conceded during argument, that neither the Base Contract nor Confirmations reveal any intent by Apache to so limit its "gas supply" to its internally designated "equity gas." Moreover, in post-submission briefs, both parties agreed that, pursuant to section 11.6 of the Base Contract, the parties *could have* inserted a specific supply source in the "Special Terms and Conditions" section of the Confirmations. However, the Confirmations reflect no such agreement, nor can we imply one in light of the Base Contract's merger clause, which states:

> 14.4 This Contract [10] sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended *only* by a writing executed by both parties.

Thus, because Apache has not demonstrated that its suggested definition of "gas

---

10. The Base Contract defines the term "Contract," as used in section 14.4, to include both the Base Contract and any subsequent Transaction Confirmations.

supply" is commonly understood in the industry or was personally known to VPEM, we will define the term according to its plain, ordinary, and generally accepted meaning. *See Zurich,* 157 S.W.3d at 465.

**2. Resolution under the Plain and Ordinary Meaning of "Gas Supply"**

The first part of this definition is straightforward. The parties do not dispute the meaning of "gas," which is defined in the Base Contract as "any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane."

However, the word "supply" is not defined. Although the precise definition of "supply" differs slightly according to the dictionary consulted, the plain and ordinary meaning of the word denotes a quantity or amount that is *"available* for use." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (1993) ("the quantity or amount (as of a commodity) needed or available," or "a quantity available for use"); BLACK'S LAW DICTIONARY 1439 (6th ed. 1990) ("available aggregate of things needed or demanded"). That definition comports with the generally accepted understanding of the word "supply." Thus, the plain and ordinary meaning of "gas supply," as used in the Base Contract, refers to the amount or quantity of gas that was *available* to satisfy VPEM's contractual demands.

Under that definition, Apache's summary-judgment evidence fails to conclusively establish that the hurricanes caused a loss or failure of "gas supply" that prevented a full delivery to VPEM at Transco–65. Its evidence consists of an affida-vit and deposition from one of its gas marketing representatives, Sean Maki. However, Maki's testimony is limited to the effect of the hurricanes on the specific platforms that Apache had *internally earmarked* to deliver to VPEM, and does not speak to any other sources of gas that might have been "available" to deliver to Transco–65.

By contrast, VPEM offered the following expert testimony from Buccigross:

> It is now clear after the fact that Apache had available uncommitted gas to fulfill VPEM's contract in the same geographical area, but instead offered that gas to new contract customers in order to obtain the benefit of the higher prices.
>
> . . . It is my opinion that Apache clearly had supply reasonably available to fulfill VPEM's firm delivery requirements at locations in the same geographic region. . . .
>
> . . . Importantly, there was **not** a total loss of Apache's gas supply due to the force majeure situation, only Apache's claim that VPEM's specific gas supply was lost, while other supply (including the gas Apache sold at higher spot prices) apparently remained intact.[11]

The record also reveals that Apache was able to deliver spot-market gas to VPEM at two other points along the Transcontinental Pipeline, including two delivery pools that appear to serve as geographic bookends to Transco–65.[12] However, Apache's summary-judgment evidence does not address the availability of any of these supply sources to meet VPEM's contract requirements.[13]

---

11. Emphasis in original.

12. That is, the Confirmations also refer to the Transco–65 Station as the "Transco Z3 Pool," which apparently lies along the same pipeline, and somewhere in between, the Transco "Z2" and "Z4" pooling areas where VPEM's

spot-market purchases were ultimately delivered.

13. The trial court ruled that Apache was not legally obligated to purchase gas on the spot market to meet its contractual commitment to

Therefore, the evidence raises a fact issue as to whether the hurricanes prevented Apache from delivering the full amount of available gas to VPEM at Transco–65. Accordingly, Apache did not conclusively establish the application of *force majeure* at that location, and was not entitled to summary judgment on that basis. *See Moore*, 261 S.W.3d at 420.

### 3. Resolution under Apache's Suggested Definition of "Gas Supply"

Even were we to embrace Apache's proposed definition of "gas supply," the summary-judgment evidence still raises a fact issue as to whether a loss or failure of its "native gas" actually precluded Apache from performing. In fact, the record indicates that, notwithstanding the hurricanes, Apache still delivered sufficient gas to Transco–65 to meet all of its stated commitments, including VPEM's, but that one purchaser—Morgan Stanley—received a disproportionate share apparently in excess of its contract allotment. Therefore, even under Apache's reading of the contract, we would still have to reverse and remand on the record presented.

The summary-judgment evidence includes a chart that reflects all of Apache's October 2005 delivery commitments to Transco–65. According to that document, Apache was contractually obligated to deliver, to that location, a total of 1,550,000 MMBtu. That amount was to be evenly distributed among five customers with each receiving 310,000 MMBtu. In fact, during October, Apache actually delivered more gas—1,623,149 MMBtu—than was necessary to meet all of its apparent contract commitments at that location.

However, one of the five customers, Morgan Stanley, received 1,024,038 MMBtu, an amount more than three times the quantity listed as its "Contract Vol[ume]." As a result, the remaining 559,111 MMBtu was left to be split equally among the four remaining customers, each of whom received roughly half of the amount due. Thus, this document raises an additional fact question as to whether the hurricanes prevented Apache from supplying enough gas, even under its limited definition of "gas supply," to satisfy its Transco–65 commitments, including VPEM's.

In an effort to explain this discrepancy, Apache notes that, on the chart, Morgan Stanley is identified as having a "rank" of "1," while VPEM's "rank" is only a "2." However, as Apache acknowledged during arguments, the summary-judgment record does not explain the significance of these rankings.[14] Instead, Apache directs us to *Tejas Power Corp. v. Amerada Hess Corp.*, in which this Court discussed the concept of ranking gas purchasers:

> As is common practice in the gas sales industry, Texas Eastern Transmission Company ("TETCO"), the pipeline sys-

VPEM, citing this court's opinion in *Tejas Power Corp. v. Amerada Hess Corp.* No. 14–98–00346–CV, 1999 WL 605550, at *3 (Tex. App.-Houston [14th Dist.] Aug. 12, 1999, no pet.) (not designated for publication). Appellants do not challenge that portion of the trial court's ruling on appeal.

14. Apache attempted to supplement the summary-judgment record with evidence that might explain Morgan Stanley's receipt of more than its apparent contract commitment. However, the trial court struck Apache's late-filed evidence as untimely. Therefore, because the trial court did not consider Apache's explanation in ruling on its motion for summary judgment, we cannot consider it, either. *See Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex.1996); *Neimes v. Ta*, 985 S.W.2d 132, 140 (Tex.App.-San Antonio 1998, pet. dism'd). We also note that, because Apache's additional evidence was not timely filed, VPEM did not have an opportunity to refute Apache's explanation of the disparate treatment given to its Transco–65 customers.

tem used, required Amerada to rank its customers in the event deliveries needed to be curtailed. TETCO used the rankings as a method of discerning which customers to ship to *if the total amount of gas expected is not available.*
No. 14–98–00346–CV, 1999 WL 605550, at *1 n. 1 (Tex.App.-Houston [14th Dist.] Aug. 12, 1999, no pet.) (not designated for publication) (emphasis added). However, *Tejas*'s description of ranking contemplates situations, unlike here, in which a supplier delivers less than the amount of gas expected. *See id.* In this case, the record suggests that Apache delivered more than the "total amount of gas expected" at Transco–65. Therefore, *Tejas* is not instructive here.

Thus, even under Apache's narrow reading of the contract, the evidence still raises a fact issue precluding summary judgment as to Apache's performance at Transco–65. We sustain appellants' first issue to that extent. Because of our resolution of that argument, we need not reach appellants' alternative argument that the Base Contract's reasonable-efforts clause, discussed above, would also have required Apache to deliver uncommitted, available gas from the same geographic region.

### CONCLUSION

We affirm the summary judgment to the extent that it excused Apache's non-performance at the Tennessee L–500 Delivery Point. However, a fact issue exists as to whether Apache suffered a loss or failure of gas supply that prevented it from fully performing at Transco–65. Therefore, we reverse that portion of the summary judgment, and we remand that dispute for further proceedings not inconsistent with this opinion.