Affirmed in Part, and Reversed and Remanded in Part, and Opinion filed August
17, 2010.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00751-CV

___________________

 

Joshua Wohlstein, Appellant

 

v.

 

Ron Aliezer AND ASW Allstate Painting &
Construction, Inc., Appellees



 



 

On
Appeal from the 334th District Court

Harris County,
Texas



Trial Court Cause No. 2006-15943-A

 



 

 

OPINION

Appellant,
Joshua Wohlstein, sued a professional rival, appellee Ron Aliezer, for
interfering with – and causing the breakup of – his business partnership.  The
trial court granted summary judgment to Aliezer and his company, appellee ASW
Allstate Painting & Construction, Inc. (“ASW”), prompting this appeal.

We conclude the evidence
raises a fact issue as to some of Wohlstein’s claims for tortious interference
and fraudulent transfer.  Therefore, we reverse those portions of the trial
court’s judgment.  Otherwise, we affirm as to the remaining causes of action.

I.

Background

The relevant facts,
viewed in the light most favorable to Wohlstein,[1]
recount a series of business transactions between a construction contractor,
Ofer Manashe, and two of his subcontractors, appellant Wohlstein and appellee
Aliezer.  Manashe plays a significant role in these underlying facts but is not
a party to this appeal.[2]

In early 2005, Manashe,
the owner and operator of Sandstone Construction, Inc. (“Sandstone”), agreed to
a series of construction contracts for the renovation of twelve apartment
complexes.  However, because he had planned to leave the country for several
months that year, he worried about Sandstone’s ability to complete the work in
his absence.

Therefore, he approached
Wohlstein, one of his subcontractors, and proposed an arrangement whereby
Wohlstein would complete the projects on Sandstone’s behalf, in exchange for a
fifty-percent share in the profits from those jobs.  According to Wohlstein,
the parties also discussed a similar agreement covering a series of future
construction projects to occur in 2006 and 2007.  

Wohlstein agreed to this
oral proposal, which was never reduced to writing.  He has described his
relationship with Manashe, at least with respect to those twelve construction
projects, as a “partnership.”  Nevertheless, Wohlstein apparently held himself
out to others, including Aliezer, as merely a “supervisor” for Sandstone. 
Whatever his actual role within Sandstone – which is disputed – he was designated
sole signatory on the company’s bank account during Manashe’s absence.

By January 2006,
Sandstone had completed all twelve construction projects and, by doing so,
earned roughly $2.4 million in net profits.  Wohlstein asserts, under the terms
of his oral contract with Manashe, he is entitled to half that amount, or $1.2
million.  However, his demand has not been paid because, once the work was
complete, Manashe allegedly reneged on the agreement to share profits with
Wohlstein.[3]

Wohlstein blames his
rival Aliezer, at least in part, for Manashe’s refusal to honor their
partnership agreement.  Aliezer, who has been Manashe’s friend for more than
thirty years, admitted he was offended by his exclusion from the lucrative
apartment-renovation projects[4]
and made his displeasure known to Manashe:

Q.        Is it accurate to say that you felt like
Sandstone Construction should have awarded those 12 jobs to ASW Allstate?

A.        Of course.  Yes.  That was my understanding to
begin with.

. . . .

Q.        Did you ever advise Ofer Manashe that you felt it
was unfair that he had awarded those contracts or that he decided to pursue
those contracts with Joshua Wohlstein instead of with ASW Allstate?

A.        I did tell him about this.

 

Appellant claims that,
in response to that conversation, Manashe agreed to renege on his partnership
agreement with Wohlstein.  That plan, however, was not without obstacles. 
Because Wohlstein was sole signatory on Sandstone’s bank account, once expelled
from the partnership, he could simply write himself a check covering his $1.2
million share of net profits.  To guard against that possibility, Manashe and
Aliezer allegedly conspired to empty the Sandstone account before
notifying Wohlstein of his ouster from the partnership.

Thus, in late January
2006, Aliezer asked Wohlstein, reportedly on Manashe’s behalf, to withdraw a
large sum of money from the Sandstone account.  Aliezer represented the money
would be wired overseas to Manashe, who had become cash-strapped and in need of
funds.  Wohlstein accommodated the request and wrote Aliezer several checks
totaling $1,090,000.  These withdrawals effectively depleted the Sandstone
account.[5]

However, Aliezer did not
wire the money to Manashe as promised.  Instead, he deposited the funds
directly into an account belonging to his own company, ASW.  He then filed at
least four assumed-name certificates with the Harris County clerk, listing
himself as the sole owner of four new Sandstone companies:  Sandstone
Construction, Sandstone Painting, Sandstone Construction and Painting, and
Sandstone Painting and Construction.

Through those new
entities, Aliezer purported to take over Sandstone’s business, evidently with
Manashe’s approval.  Manashe informed appellant that the business had been sold
to Aliezer, and he further notified Sandstone’s clients that Wohlstein was no
longer affiliated with the company.

Wohlstein immediately
filed suit against Manashe, Sandstone, Aliezer, and ASW.  Aliezer and ASW filed
a traditional and no-evidence motion for summary judgment.  The court granted
the motion without specifying the basis for its ruling.  Following severance,
the summary judgment became final.

This appeal followed. 
Generally, appellant contends the trial court erred by granting summary
judgment[6]
because the record raises a fact issue as to his claims for tortious
interference, participation in breach of fiduciary duty, fraud, negligent
misrepresentation, conspiracy, and fraudulent transfer.

II.

Standard of
Review

The standards we use to
review a summary-judgment order are well-settled.  See Seidner v. Citibank
(S.D.) N.A., 201 S.W.3d 332, 334 (Tex. App.—Houston [14th Dist.] 2006, pet.
denied).  A party seeking summary judgment must demonstrate his entitlement to
judgment as a matter of law.  See Tex. R. Civ. P. 166a(c); Nixon v.
Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985).  If the evidence
establishes the movant’s apparent right to summary judgment, the burden then
passes to the non-movant to raise a genuine issue of material fact to defeat
the motion.  See Va. Power Energy Mktg., Inc. v. Apache Corp., 297
S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

On appeal, we review the
summary-judgment motion and evidence de novo.  See Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  We must consider the
evidence in the light most favorable to the non-movant – here, Wohlstein –
while indulging reasonable inferences and resolving doubts in his favor.  See
City of Keller v. Wilson, 168 S.W.3d 802, 824 (Tex. 2005); Va. Power,
297 S.W.3d at 402.  When the summary-judgment order fails to specify the basis
for the trial court’s ruling, as here, we will affirm on any meritorious
argument advanced in the motion.  See Harwell v. State Farm Mut. Auto. Ins.
Co., 896 S.W.2d 170, 173 (Tex. 1995); Ortiz v. Collins, 203 S.W.3d 414,
420 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  In that scenario, the
appellant must therefore demonstrate the trial court could not properly grant
summary judgment on any ground asserted in the motion.  See Chappell Hill
Bank v. Smith, 257 S.W.3d 320, 324 (Tex. App.—Houston [14th Dist.] 2008, no
pet.).

III.

Analysis

In his petition,
Wohlstein advanced six causes of action against appellees:  (1) tortious
interference, (2) participation in breach of fiduciary duty, (3) fraud, (4)
negligent misrepresentation, (5) civil conspiracy, and (6) violation of the
Texas Uniform Fraudulent Transfer Act (“TUFTA”).  These multiple theories may
be grouped, for the sake of disposition, into two general allegations of
wrongdoing.

First, Wohlstein
contends appellees improperly interfered in his relationship with Manashe,
causing the latter to breach their partnership agreement, and thereby deprived
appellant of an equal share of Sandstone’s past and future profits.  Second,
appellant claims appellees tricked him into voluntarily transferring $1,090,000
out of the partnership’s bank account and into ASW’s coffers.  We will address
each group separately, beginning with Wohlstein’s interference-related claims.

A.        Interference-Related
Claims

This set of claims
encompasses two causes of action:  tortious interference and knowing
participation in breach of fiduciary duty.  Both theories arise from the same
operative facts.  Specifically, appellant contends Aliezer encouraged Manashe
to expel Wohlstein from the alleged partnership and, in so doing, breach
various fiduciary duties owed him.

1.         Tortious Interference

The parties further
subdivide Wohlstein’s tortious-interference allegations into two distinct
subsets:  (1) interference with the oral partnership agreement respecting the
twelve apartment-renovation projects in 2005, and (2) interference with an
agreement to collaborate on future construction jobs in 2006 and 2007.  Because
appellees presented different summary-judgment grounds for these two
categories, we handle each group separately.

a.         2005 Projects

As to the
already-completed work, appellees presented two grounds for traditional summary
judgment.[7] 
We find no merit in either argument.

First, appellees argued that
Wohlstein, in his deposition, expressly disavowed any claim for tortious
interference during the following exchange:

Q.        [W]hen you mentioned earlier what claims you had
against my client [Aliezer], you mentioned . . . that you have a claim against
my client for interfering with your contract.  Do you remember saying that?

A.        Yes.  But that’s not a claim that I made, I just
responded to him.  He said something about I interfered with him, so I said,
you know, I — it’s not my claim.

Q.        Okay.  So that’s not what you’re claiming?

MR. McFARLAND:  Form.

Q.        So that’s – I’m sorry.  That’s not what you’re
claiming?

MR. McFARLAND:  Form.

A.        No.

 

However, even were we to
read that portion of the deposition as some sort of binding admission, Wohlstein
clarified that testimony through an errata sheet that accompanied the signature
page to his deposition.  Noting he had misunderstood counsel’s questions,[8] Wohlstein
corrected that testimony to read, “It is my claim.”  See Tex. R.
Civ. P. 203.1(b) (permitting a witness to make corrections or revisions to his
deposition testimony).  Therefore, that equivocal testimony, later revised,
cannot form the basis for summary judgment.

Second, Aliezer
testified, by affidavit, that he was unaware of any partnership
involving Wohlstein – inasmuch as he had been told appellant was simply a
“supervisor” – and therefore could not be liable for the intentional
tort of interference.  See Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207
(Tex. 2002) (confirming a tortious-interference claim requires proof that the
defendant willfully and intentionally interfered with the claimant’s
contract).  Specifically, Aliezer testified:

In 2005, I was told by Joshua
Wohlstein that he was working for Ofer Manashe as a supervisor for $3,000 per
month.  I had no knowledge of the existence of any other alleged agreements
between Wohlstein and Sandstone, or of the alleged terms of any other alleged
agreement between Wohlstein and Sandstone, until after the relationship between
Wohlstein and Sandstone terminated in mid-February of 2006.

 

However, summary
judgment should generally not be granted as to issues of knowledge or intent
because the non-movant cannot readily controvert a defendant’s self-serving
denials.  See Tex. R. Civ. P. 166a(c) (“A summary judgment may be based
on uncontroverted testimonial evidence of an interested witness . . . if the
evidence . . . could have been readily controverted.”); Frias v. Atl.
Richfield Co., 999 S.W.2d 97, 106 (Tex. App.—Houston [14th Dist.] 1999,
pet. denied); RRR Farms, Ltd. v. Am. Horse Prot. Ass’n, Inc., 957 S.W.2d
121, 132 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).  Here, the
factfinder’s determination of appellees’ knowledge and intent turns, at least
in part, upon Aliezer’s credibility.  See Frias, 999 S.W.2d at 106. 
Therefore, the trial court could not properly grant summary judgment on that
basis.  See id.

Here, neither ground
asserted by appellees supports summary judgment on tortious interference
arising from the 2005 construction projects.  Therefore, we reverse that
portion of the judgment.

b.         2006/2007 Projects

However, we affirm
summary judgment as to alleged interference with the 2006/2007 construction
contracts because appellant did not challenge every ground asserted below. 
Specifically, appellees moved for traditional summary judgment on their
affirmative defense of justification.[9] 
See Butnaru, 84 S.W.3d at 207; Prudential Ins. Co. of Am. v. Fin.
Review Servs., Inc., 29 S.W.3d 74, 77–78 (Tex. 2000); Baty v. ProTech
Ins. Agency, 63 S.W.3d 841, 857 (Tex. App.—Houston [14th Dist.] 2001, pet.
denied).  Wohlstein did not respond to that argument in its summary-judgment
response or appellate brief.

An appealing party must
challenge and negate all possible grounds on which summary judgment could have
been granted; otherwise, we must uphold the judgment on that basis.  See
Chappell Hill Bank, 257 S.W.3d at 324; De Laurentis v. United Servs.
Auto. Ass’n, 162 S.W.3d 714, 726 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  Because Wohlstein failed to do so, we affirm that portion of the
judgment.  See Chappell Hill Bank, 257 S.W.3d at 324.

2.         Participation in Breach of Fiduciary
Duty

Similarly, Wohlstein did
not respond to a no-evidence summary-judgment ground raised in response to his
claim for knowing participation in breach of fiduciary duty.  Specifically,
appellees denied liability because there was no evidence Aliezer knew of the existence
of any relationship giving rise to such duties.[10]  See Baty,
63 S.W.3d at 863 (“[W]here a third party knowingly participates in the
breach of duty of a fiduciary, such third party becomes a joint tortfeasor with
the fiduciary and is liable as such.”) (emphasis added) (citations omitted).  

As previously noted,
issues of intent and knowledge are generally inappropriate for summary
judgment.  See Frias, 999 S.W.2d at 106.  Nevertheless, because
appellant wholly failed to respond to a no-evidence point, the trial court was
obligated to grant the motion.  See Tex. R. Civ. P. 166a(i) (stating a
court must grant a no-evidence motion absent a response raising a
genuine issue of material fact); Hamilton v. Wilson, 249 S.W.3d 425, 426
(Tex. 2008); Arguelles v. Kellogg Brown & Root, Inc., 222 S.W.3d
714, 723 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  

Accordingly, we affirm
that portion of the trial court’s judgment.

B.        Transfer-Related
Claims

Wohlstein’s second category
of claims – fraud, negligent misrepresentation, conspiracy, and fraudulent
transfer – arise from Aliezer’s allegedly deceitful removal of money from the
partnership bank account.  Generally, appellant contends Aliezer misrepresented
his plans to wire the withdrawn funds to Manashe, at the latter’s request, when
his actual intent was simply to wrest the money from Wohlstein’s
control.[11]

1.         Fraud and Negligent Misrepresentation

Appellees moved for
summary judgment on fraud and negligent misrepresentation, arguing Wohlstein
did not incur any damages as a result of the transfer.[12]  See Aquaplex,
Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774 (Tex. 2009)
(confirming fraud claim requires proof of some legal injury); Lennar Corp.
v. Great Am. Ins. Co., 200 S.W.3d 651, 696 (Tex. App.—Houston [14th Dist.]
2006, pet. denied) (requiring proof of pecuniary loss to support
negligent-misrepresentation claim).  In support, they offered Wohlstein’s
deposition testimony, in which he (1) denied any ownership interest in the
transferred funds and (2) admitted Sandstone – and, by extension, Manashe – could
freely distribute its own money in its sole discretion.

While conceding those evidentiary
points, Wohlstein suggests he suffered a legal injury because, although he did
own the funds in Sandstone’s account, the transfer reduced his bargaining
“leverage” with Manashe.  He testified:

[T]hese funds had nothing to do with the money that
[Aliezer] wants to, you know, move overseas.

            It wasn’t his money in the first place and he
basically – he – he defraud[ed] me.  He lied to me, kept telling me that’s the
reason he did it.  He did it to get the funds out of the account so, at the
end of the day, him and – he – I mean Ofer Manashe and he would have all the
money in their possession and they can basically tell me to – to take a hike.

. . . .

I was worse off just from the fact
that the money was, you know, got out of my account.  I had nothing to do with
the money going overseas.  It has nothing — none of my business, if he didn’t
move it or whatever.  I was worse off because the funds got out of my
control.

. . . .

. . . I’m suing Ronnie Aliezer
because . . . he lied to me about the way to do it by telling me he can move
the money overseas – overseas to put Ofer in a better bargaining position
later on or him helping him, for me to – to – how much money I would get for
the jobs I performed.[13]

 

His
briefing reframes that testimony as follows:

Aliezer’s inducing [Wohlstein] into transferring $1,090,000
out of his control so that Sandstone could effectively renege on the obligation
to pay him his share of the profits on the twelve projects caused him damages.
. . .

. . . The point was that Wohlstein
would not have the funds on hand when Manashe pulled the plug on the
relationship and refused to pay him his share[.]

 

But, as this court has
observed, Texas law does not currently recognize “lost bargaining leverage,” by
itself, as a legally compensable injury.[14] 
See Swanson v. Wells Fargo Home Mtge., No. 14-02-00732-CV, 2003 WL
22945646, at *3 (Tex. App.—Houston [14th Dist.] Dec. 16, 2003, no pet.) (mem.
op.).  Swanson featured this same legal issue in a slightly different
factual context, and therefore merits some further discussion.

The dispute in Swanson
involved a construction loan agreement that required written authorization by
the homeowners – the Swansons – before funds could be disbursed to the home
builder.  See id. at *1.  Notwithstanding that clause, the lender –
Norwest – made several disbursements to the builder without seeking the
Swansons’ approval.  See id.  The Swansons later discovered multiple
construction defects in their home but were unable to locate the builder, so
they sued the lender instead.  See id. at *1 n.1.  They contended Norwest
breached the loan agreement by making unauthorized disbursements to the
builder, and they sought damages for the cost to remedy the construction
defects.  See id. at *1.

Norwest moved for
summary judgment, arguing its conduct did not cause the Swansons’ alleged
damages.  See id. at *2.  In response, the claimants insisted Norwest,
by paying the builder without their consent, deprived them of “leverage” they
could have wielded to withhold payment and thereby force the builder to correct
the defects.  See id. at *2–*3.  This court declined to recognize that
claim:

To recover compensatory damages
[for breach of contract], the plaintiff must prove that he suffered some
pecuniary loss as a result of the breach.  The evidence must demonstrate the
damages are the natural, probable, and foreseeable consequence of the
defendant’s conduct.  The right to recover for the breach of a contract will be
defeated if (1) no damage was suffered by the complaining party despite the
breach, or (2) if the damages which he sustained did not result from the
breach. . . .

. . . The Swansons . . . claim
that by not obtaining their consent to disbursement requests, they did not have
an “opportunity to stop construction to alleviate defects.”

. . . .

The alleged “damage” to the Swanson’s,
i.e., lack of leverage, was not a foreseeable consequence of Norwest’s
purported breach of the loan agreement.

 

Id.
(citations omitted).  Accordingly, this court affirmed summary judgment on all
claims.  See id. at *3.

Here, as in Swanson,
the claimant has not shown he incurred any legal injury solely as a result of
the transfer.  To the contrary, Wohlstein conceded his lost-profits claim
against Manashe does not hinge on the physical location of the funds
withdrawn from Sandstone’s bank account.  Therefore, we affirm summary judgment
as to those claims – fraud and negligent misrepresentation – which require
proof of damages as a prerequisite to recovery. 

2.         Conspiracy to Commit Fraud

Finding no viable fraud
claim, we must also affirm summary judgment on Wohlstein’s derivative claim for
conspiracy to commit fraud.  A successful claim for civil conspiracy requires
proof that two or more persons, with the mutual intent to achieve some goal,
committed one or more overt and unlawful acts, thereby resulting in damages to
the claimant.  See Baty, 63 S.W.3d at 864.  Civil conspiracy is often
described as a “derivative tort” because a defendant’s liability requires proof
of his participation in another underlying tort for which the plaintiff
seeks to hold him liable.  See id. (citing Tilton v. Marshall,
925 S.W.2d 672, 681 (Tex. 1996)).  

Here, the underlying
tort, according to Wohlstein’s pleadings, was fraud.  However, we have already
determined the trial court properly granted summary judgment as to fraud. 
Therefore, we must affirm summary judgment on Wohlstein’s derivative claim for
conspiracy to commit fraud.  See Ernst & Young, L.L.P. v. Pac. Mut. Life
Ins. Co., 51 S.W.3d 573, 583 (Tex. 2001) (holding summary judgment as to
fraud claim disposed of dependent conspiracy claim); Rodarte v. Investeco
Group, L.L.C., 299 S.W.3d 400, 413 (Tex. App.—Houston [14th Dist.] 2009, no
pet.); Baty, 63 S.W.3d at 864.

3.         Fraudulent Transfer

However, a successful
claim under the Texas Uniform Fraudulent Transfer Act (“TUFTA”) does not
require proof of actual damages resulting from a transfer.  See Tex.
Bus. & Comm. Code Ann. §§ 24.005–.006 (Vernon 2009) (setting forth elements
of fraudulent-transfer claim).  Thus, Wohlstein’s inability to demonstrate
actual damages – though fatal to his claims for fraud and negligent
misrepresentation and, by extension, conspiracy – does not necessarily affect
his claims under TUFTA.

TUFTA was designed to
prevent a debtor from defrauding its creditors by moving assets out of reach.  See
Mladenka v. Mladenka, 130 S.W.3d 397, 404 (Tex. App.—Houston [14th Dist.]
2004, no pet.).  To accomplish that end, TUFTA permits a creditor, under
certain circumstances, to set aside a debtor’s fraudulent transfer of assets.  See
Tex. Bus. & Comm. Code Ann. § 24.008(a) (Vernon 2009); Goebel v.
Brandley, 174 S.W.3d 359, 362 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  A transfer may be considered fraudulent, under the relevant portions
of the statute,[15]
if done with “actual intent to hinder, delay, or defraud any creditor of the
debtor.”  Tex. Bus. & Comm. Code Ann. § 24.005(a)(1).

In this case, appellees
presented three summary-judgment grounds, arguing (1) Wohlstein sought only
money damages which, they insist, cannot be recovered under TUFTA; (2) appellees
did not qualify as “transferees,” and therefore cannot be held liable under
TUFTA, because they did not exercise legal dominion or control over the
transferred funds; and (3) there was no evidence of Manashe’s intent to
“hinder, delay, or defraud” Wohlstein.  We find these arguments unconvincing,
and therefore reverse summary judgment as to Wohlstein’s TUFTA claims.

a.         Recoverability of Money Damages Under
TUFTA

First, appellees suggest
Wohlstein’s request for money damages runs afoul of section 24.008, which
entitles a successful claimant to avoid “the transfer or obligation to the
extent necessary to satisfy the creditor’s claim.”  Id. § 24.008(a)(1). 
We disagree.  Chapter 24 authorizes both equitable relief – that is, nullification
of a fraudulent transfer – and money damages up to the value of the property
transferred.  See id. §§ 24.008, 24.009(b), (c); Chu v. Hong, 249
S.W.3d 441, 446 (Tex. 2008).  Accordingly, the trial court could not properly
grant summary judgment on that basis.

b.         Appellees’ Status as Transferees

Second, appellees
contend this transaction does not qualify as a “transfer,” and therefore is not
governed by TUFTA, because they did not receive the money as “transferees.”  In
support, appellees cite Newsome v. Charter Bank Colonial, in which this
court defined a “transferee” as one with “legal dominion or control over the
funds . . . [and] the right to put the money to one’s own use.”  940 S.W.2d
157, 165 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  Stated
differently, a party is a “transferee,” within the meaning of TUFTA, if it
could freely “invest the whole [amount] in lottery tickets or uranium stocks,”
if it so desired.  Id. (quoting Matter of Coutee, 984 F.2d 138,
141 (5th Cir. 1993)).  

Under that definition, a
bank impounding funds under a writ of garnishment would not qualify as a
transferee, nor would a law firm holding its client’s money in trust, because
neither could freely spend the funds in its possession.  See Newsome,
940 S.W.2d at 166; Coutee, 984 F.2d at 141.  This case, however, does
not resemble either of those scenarios.

Instead, the evidence
indicates appellees accepted the transferred funds as an advance relative to various
construction projects.[16] 
The record suggests no limitations on their use of these funds.  Therefore, we
hold the evidence raises a fact issue under TUFTA.  See Walker v. Anderson,
232 S.W.3d 899, 916–17 (Tex. App.—Dallas 2007, no pet.) (holding loan advances
qualified as “transfers” under TUFTA).  Accordingly, the trial court could not
have properly granted summary judgment on that basis.

c.         Evidence of Intent to Defraud

Third, appellees claim
the record contains no evidence of Manashe’s intent to “hinder, delay, or
defraud” Wohlstein, a necessary element of his TUFTA cause of action.  See
Tex. Bus. & Comm. Code Ann. § 24.005(a)(1).  However, that issue is not
appropriate for summary judgment, except in limited circumstances not present
here,[17]
because intent, like knowledge, is a question of fact generally reserved for
the jury.  See Hahn v. Love, ___ S.W.3d ___, 2009 WL 793637, at *6–*8
(Tex. App.—Houston [1st Dist.] March 26, 2009, pet. denied); Coleman Cattle
Co. v. Carpentier, 10 S.W.3d 430, 433–34 (Tex. App.—Beaumont 2000, no
pet.).  

Moreover, Wohlstein
presented evidence raising a fact question as to Manashe’s intent to defraud which,
in the absence of direct proof, may be shown through circumstantial evidence.  See
Mladenka, 130 S.W.3d at 405.  Under section 24.005(b), fraudulent intent
may be inferred from a consideration of several non-exclusive factors,
sometimes called “badges of fraud.”  See id. (citing Tex. Bus. &
Comm. Code Ann. § 24.005(b)).  Although there is no magic number of factors
that must exist, the presence of several “badges” may support an inference of
fraud.  See id.; Walker, 232 S.W.3d at 914; G.M. Houser, Inc.
v. Rodgers, 204 S.W.3d 836, 843 (Tex. App.—Dallas 2006, no pet.).

Here, the record
contains at least some evidence of several “badges” which, if believed,[18] could support an
inference of fraudulent intent, including:

·       
the transfer was made to an “insider”;[19]

·       
the debtor – Sandstone – ultimately retained possession or
control of the funds after the transfer;[20]

·       
the transfer was of substantially all Sandstone’s assets;[21] and

·       
the transfer occurred at a time – January through February 2006 –
shortly before or after Sandstone incurred a substantial debt to Wohlstein, who
claimed a fifty-percent interest in profits from construction projects that had
just been completed in January 2006.

See
Tex. Bus. & Comm. Code Ann. § 24.005(b)(1), (2), (5), (10).  We hold that
evidence, considered in the light most favorable to Wohlstein, raises a fact
issue precluding summary judgment as to Manashe’s fraudulent intent.  See
Mladenka, 130 S.W.3d at 405.  Accordingly, we reverse judgment on
Wohlstein’s fraudulent-transfer claims under chapter 24.

C.        Mental
Anguish Damages

Finally, the trial court
granted summary judgment on Wohlstein’s request for an award of mental anguish
damages.  He does not challenge that ruling on appeal.  Therefore, we affirm
the trial court’s judgment as to that claim.  See Sonic Sys. Int’l, Inc. v.
Croix, 278 S.W.3d 377, 389 n.19 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied); see also Garcia v. State Farm Lloyds, 287 S.W.3d 809, 820–21
(Tex. App.—Corpus Christi 2009, pet. denied) (affirming summary judgment on claimant’s
alleged mental-anguish damages); Rivera v. Countrywide Home Loans, Inc.,
262 S.W.3d 834, 842 (Tex. App.—Dallas 2008, no pet.) (same).

IV.

Conclusion

We hold the evidence
raises a fact issue that precludes summary judgment on Wohlstein’s claims that
appellees (1) tortiously interfered with his 2005 construction contract and (2)
participated in a fraudulent transfer of assets under chapter 24 of the Texas
Business and Commerce Code.  Therefore, we reverse summary judgment as to those
claims and remand them to the trial court.  Otherwise, we affirm the judgment
in all respects as to Wohlstein’s remaining claims.

 

                                                                                    

                                                                        /s/        Kent
C. Sullivan

                                                                                    Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Seymore and Sullivan.

 









[1] See Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Although appellees tell a
different version of this story, to the extent of any conflicts in the
summary-judgment evidence, we are bound to accept Wohlstein’s account.  See
id.





[2] The trial court severed
Wohlstein’s claims against appellees from the main lawsuit against Manashe, and
this appeal arises from those severed claims.





[3] Manashe has denied the
existence of any agreement, oral or otherwise, to share profits with Wohlstein.





[4] Appellant suggests
Manashe chose him for these projects, instead of Aliezer, because he offered
Manashe a greater share of profits (fifty percent) than Aliezer customarily did
(fifteen percent).





[5] The record does not
indicate the whereabouts of the remaining profits from the $2.4 million
construction project.





[6] Appellant does not
challenge the trial court’s rulings denying his motion for reconsideration and
motion for new trial.





[7] Appellees presented a
no-evidence point relating to the 2006/2007 projects but not those undertaken
in 2005.  Specifically, he argued in his motion:

There is no evidence that
Aliezer had knowledge of the alleged 2006/2007 agreement or of
Wohlstein’s alleged interest in it or that Aliezer had knowledge of such facts
and circumstances that would lead a reasonable person to believe that there was
a contract in which Wohlstein had an interest. . . .

. . . There is no evidence
that Aliezer took an active part in persuading Manashe and Sandstone to
terminate the alleged 2006/2007 agreement between Wohlstein and Sandstone.

(Emphases added).





[8] During oral argument,
counsel confirmed English is not appellant’s native language.





[9] Appellees also contend
the oral contract was unenforceable under the Statute of Frauds.  Because we
affirm on other grounds, we need not address that argument.  See Tex. R.
App. P. 47.1.





[10] Specifically, Aliezer
argued, “as set forth above, there is no evidence that Aliezer had any
knowledge of the alleged joint venture relationship between Sandstone and
Wohlstein or of the terms of any such alleged relationship.”





[11] Notably, Wohlstein did
not assert a conversion claim against Aliezer.  See Hunt v. Baldwin, 68
S.W.3d 117, 131 (Tex. App.—Houston [14th Dist.] 2001, no pet.).





[12] In addition, appellees
asserted (1) Aliezer’s alleged misrepresentation was immaterial and
insufficient to support a fraud claim, and (2) Wohlstein did not rely on
Aliezer’s promise to send money overseas, and therefore had no viable claim for
fraud or negligent misrepresentation.  See Ernst & Young, L.L.P. v. Pac.
Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001) (listing elements of
common-law fraud); McCamish, Martin, Brown & Loeffler v. F.E. Appling
Interests, 991 S.W.2d 787, 791 (Tex. 1999) (stating elements of negligent
misrepresentation).  Because we affirm summary judgment on other grounds – the
absence of recoverable damages – we need not address these alternative
contentions.  See Tex. R. App. P. 47.1.





[13] Emphases added.





[14] Our research also
uncovered other jurisdictions that apparently decline to recognize “lost
bargaining leverage” as a recoverable element of damages.  See Steffen v.
Akerman Senterfitt, No. 804CV1693T24MSS, 2005 WL 3277894, at *7 (M.D. Fla.
Dec. 2, 2005) (“This Court finds that the injury alleged by Plaintiff, i.e.,
loss of negotiating leverage, is too speculative to support the causation
element of Plaintiff’s legal malpractice claim.”); In re Belmar, 319
B.R. 748, 757 (Bankr. D.D.C. 2004) (“It is highly questionable whether, under
District of Columbia law, the Belmars’s alleged ‘loss of leverage’ constitutes
a legally cognizable harm . . .”); Jarrell v. Petoseed Co., 500 S.E.2d
793, 796 (S.C. Ct. App. 1998) (“Possible loss of leverage at the bargaining
table . . . does not translate to actual damages.”).





[15] The statute also
disallows other kinds of fraudulent transfers not germane to this dispute.  See
Tex. Bus. & Comm. Code Ann. §§ 24.005(a)(2), 24.006.

 





[16] Aliezer testified, by
affidavit:  “In late January and early February of 2006, Joshua Wohlstein
delivered funds from and/or on behalf of Sandstone to ASW totaling $1,090,000. 
These payments were advances to ASW on various projects on which ASW was
working for Sandstone in or about the first quarter of 2006.”





[17] Specifically, intent to
defraud may be decided as a matter of law if the defendant confesses to fraud
or the evidence conclusively establishes the absence of such intent.  See
Mladenka, 130 S.W.3d at 405 n.13; Coleman Cattle Co. v. Carpentier,
10 S.W.3d 430, 434 (Tex. App.—Beaumont 2000, no pet.).  Appellees make no such
contention here.





[18] See City of Keller,
168 S.W.3d at 824; Va. Power, 297 S.W.3d at 402.





[19] Section 24.002(7)
provides a few examples of “insiders,” but its list is considered illustrative
rather than exhaustive.  See Tex. Bus. & Comm. Code Ann. § 24.002(7)
(Vernon 2009); Hahn, ___ S.W.3d at ___, 2009 WL 793637, at *6 n.8; Jackson
Law Office, P.C. v. Chappell, 37 S.W.3d 15, 25–26 (Tex. App.—Tyler 2000,
pet. denied).  Instead, insider status is to be determined by considering (1)
the closeness of the relationship between the debtor and transferee, and (2)
whether the transaction was conducted at arm’s length.  See Hahn, ___
S.W.3d at ___, 2009 WL 793637, at *6 n.8; Jackson Law Office, 37 S.W.3d
at 26.  

After considering the evidence relating to those two
factors, we conclude a fact issue exists as to Aliezer’s status as an “insider”
to Manashe.  The record contains few details about their actual dealings
leading up to the transfer of funds.  However, the evidence reflects they had
been friends for over thirty years and frequently worked together, facts
indicative of a fairly close relationship.





[20] Specifically, Aliezer
testified the transferred funds were ultimately returned to Sandstone.





[21] Manashe admitted the
Sandstone bank account was almost empty after the transfer to ASW and Aliezer.