# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2024

Lyle W. Cayce
Clerk

———————

No. 23-10575

———————

Mieco, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Pioneer Natural Resources USA, Incorporated,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-1781

_____

Before Stewart, Duncan, and Engelhardt, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Pioneer Natural Resources contracted to sell natural gas to MIECO. During Winter Storm Uri in 2021, Pioneer invoked the contract's force majeure clause to excuse its failure to deliver agreed-upon amounts of gas. MIECO sued for damages. The federal district court granted Pioneer summary judgment, ruling that Pioneer properly invoked force majeure.

On appeal, we conclude that the district court correctly interpreted the force majeure clause. Specifically, the clause's terms do not require Pioneer to show that the storm rendered its performance under the contract

No. 23-10575

literally impossible, as MIECO argues. Furthermore, Pioneer's "gas supply" under the clause encompasses only the gas Pioneer regularly produced from the Permian Basin—and not, as MIECO argues, substitute gas that Pioneer does not own but could purchase on the spot market.

We must reverse the district court's judgment on one issue, however. The force majeure clause required Pioneer to exercise due diligence to overcome Uri's impact on its ability to deliver gas to MIECO. Fact disputes remain over whether Pioneer did so. Summary judgment was therefore improper. The case must be remanded for fact finding on that issue.

Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

## I. Background

Pioneer produces natural gas in west Texas's Permian Basin and sends this gas to Targa Pipeline Mid-Continent WestTex's plant for processing. Targa processes the gas, keeping a portion as payment, and Pioneer then sells the final product and transfers it to customers. One of those customers is MIECO, L.L.C., an energy trading firm that buys and resells natural gas. Pioneer produces the vast majority of its gas from wells in the Permian Basin and, when production is insufficient to meet contractual demands, purchases supplemental gas from third parties on the spot market.

MIECO and Pioneer ("the Parties") entered a "Firm"[1] contract in 2014 and again in 2020 wherein Pioneer agreed to deliver 20,000 MMBtu of gas daily to MIECO at the Ehrenberg pooling hub on the Arizona-California border. To memorialize their agreement, the Parties used the base contract

---

[1] A "Firm" commitment is defined in the NAESB base contract as requiring "that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure."

No. 23-10575

published by the North American Energy Standards Board ("NAESB"), which has been widely adopted in the oil and gas industry.[2]

The base contract has four parts: (i) the "Base Contract for Sale and Purchase of Natural Gas" provides basic information about the Parties and contains their contractual elections; (ii) the "General Terms and Conditions" contains a preformatted set of definitions and provisions governing the parties' rights, obligations, and remedies based upon their elections; (iii) "Transaction Confirmations" specify the terms for each transaction and can individualize specific delivery obligations; and (iv) "Addendum and Special Provisions" that may supersede or replace the general definitions and individualize the parties' agreement. If a seller defaults through non-delivery, Section 3 obligates the seller to pay the difference between the contract price for the gas and (1) the price the buyer paid for replacement gas or (2) the spot market gas price at the time of non-delivery.

The Parties agreed to several special provisions, some of which amended the base contract's force majeure provisions, as bolded below.

> <u>Section 11.1</u>: [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means ***an event or circumstance which prevents one party from performing its obligations under one or more Transactions, which event or circumstance was not anticipated as of the date of the Transaction was agreed to, which is not within the reasonable control of, or the result of***

---

[2] The NAESB is the consensus organization of United States oil and gas producers, and many of its standards have been adopted by both the federal and state governments. *See Luminant Energy Co. v. Koch Energy Servs., LLC*, 551 F. Supp. 3d 373, 379 n.5 (S.D.N.Y. 2021) (explaining that NAESB "creates standards for the gas and electricity industries").

No. 23-10575

***the negligence of, the claiming party, and which, by the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided***, as further defined in Section 11.2.[3]

<u>Section 11.2</u>: Force Majeure shall include, but not be limited to, the following . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe . . . Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

<u>Section 11.3</u>: Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by . . . (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in any case, as provided in Section 11.2.

On February 14 and 15, 2021—during Winter Storm Uri—Pioneer failed to deliver the full amount of gas to Ehrenberg and provided MIECO no forewarning. Around midnight on February 16, Pioneer notified MIECO of force majeure, explaining it could not deliver the full amount of gas due to the storm. From February 16 until 19, Pioneer delivered no gas at all. MIECO purchased more expensive replacement gas on the spot market each day, costing it approximately $9 million more than the contract price.

Pioneer resumed daily delivery of the full contractual amount of gas on February 20 and continued until March 1 when it delivered only 17,600 MMBtu. MIECO again had to purchase replacement gas from the spot market, costing $2,388 more than the contract price. After March 1, Pioneer delivered the full amount of gas without interruption. When Pioneer sent an

---

[3] Section 11.1 originally read: "The term 'Force Majeure' as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2."

4

invoice for March 2021, MIECO underpaid by $2,388 to cover the cost of replacement gas on March 1.

MIECO then sought $9 million in cover damages from Pioneer for the spot market gas it had to purchase during the storm. Pioneer refused to pay, however, claiming Uri's impact on "natural gas deliveries from natural gas processors in the Permian Basin" constituted force majeure. MIECO subsequently sued for breach of contract in the Northern District of Texas on July 30, 2021. Pioneer counterclaimed, alleging MIECO breached the contract by withholding $2,388 in payment for March 2021. Following discovery, both parties moved for summary judgment.

The court granted summary judgment for Pioneer, dismissing MIECO's breach of contract claim due to force majeure.[4] The court found the force majeure clause was unambiguous and did not require Pioneer to purchase available spot market gas at Ehrenberg, as MIECO argued. Specifically, the court rejected MIECO's argument that a qualifying force majeure event "prevent[s]" performance only when it "render[s] performance literally impossible." MIECO's interpretation, the court reasoned, would make other contractual provisions superfluous, such as Section 11.1's requirement that the claiming party be "unable to overcome or avoid" force majeure as well as many of the events excluded from force majeure under Section 11.3. The court also held that MIECO's reading would be duplicative of the common law doctrine of impossibility.

Additionally, the court rejected MIECO's argument that the term "Seller's gas supply" includes spot market gas that "Pioneer . . . could have

---

[4] The court denied the Parties' cross-motions for summary judgment concerning Pioneer's $2,388 counterclaim, finding a genuine dispute as to whether inclement weather supported the March 1 force majeure declaration. Pioneer later voluntarily dismissed this counterclaim.

purchased and timely delivered to MIECO." The court reasoned this interpretation would also be duplicative of common law impossibility because it would require Pioneer to purchase and deliver gas so long as it was available anywhere in the world at any price. Thus, even if no available gas existed anywhere, Pioneer would still be liable for non-delivery unless one of Section 11.2's qualifying force majeure events occurred. Finding these interpretations unreasonable, the court held that "Seller's gas supply" included only "the gas Pioneer receives from Targa in the Permian Basin."

MIECO subsequently filed a motion for reconsideration under Federal Rule of Civil Procedure 54(b), raising two arguments. First, MIECO argued that Pioneer's non-performance on February 14 and 15 could not be excused because Pioneer had not yet provided notice of force majeure. Second, MIECO argued that Pioneer violated Section 11.2's requirement that it "make reasonable efforts" to avoid the "adverse impacts" of force majeure. The court rejected MIECO's first argument because it was raised for the first time in the motion for reconsideration. It did not explicitly address MIECO's second argument but denied the motion and entered final judgment. MIECO timely appealed.

## II. Standard of Review

We review summary judgments *de novo. See HS Res., Inc. v. Wingate*, 327 F.3d 432, 440 (5th Cir. 2003). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All facts and reasonable inferences are construed in favor of the nonmovant[.]" *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). We also

review the interpretation of a contract *de novo. See Barnard Constr. Co. v. City of Lubbock*, 457 F.3d 425, 427 (5th Cir. 2006).

### III. Discussion

The Parties' contract specifies that New York law applies. Under New York law, "agreements are construed in accord with the parties' intent" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citations and quotation marks omitted). When interpreting a contract, "[t]he words and phrases used by the parties must . . . be given their plain meaning." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). A court may consider extrinsic evidence outside the four corners of the contract only if the language is ambiguous. *Greenfield*, 780 N.E.2d at 170. And courts should reject interpretations that render contractual language superfluous. *See Lawyers' Fund for Client Prot. of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 727 N.E.2d 563, 566–67 (N.Y. 2000).

MIECO challenges the district court's ruling on multiple grounds. First, it argues that, contrary to the district court's view, a force majeure event "prevents" performance only by making performance impossible. Second, it contends the term "Seller's gas supply" includes spot market gas available for purchase, not just Pioneer's gas in the Permian Basin. Third, it maintains that the court failed to make findings about whether Pioneer's performance was actually prevented, whether Pioneer exercised "due diligence . . . to overcome" force majeure, and whether Pioneer made "reasonable efforts" to avoid the impacts of force majeure, which are fact disputes precluding summary judgment. We address each argument in turn.[5]

---

[5] MIECO also argues Pioneer is liable for cover damages on February 14–15, 2021 because it provided notice of force majeure only on February 16. But MIECO forfeited

No. 23-10575

## A.

We first address MIECO's argument that, under the contract, a force majeure event "prevents" performance only by rendering performance literally impossible. We agree with the district court that MIECO's interpretation is not supported by the contract's text or context, nor by any applicable precedent.

### 1.

Start with the text. *See Ellington*, 21 N.E.3d at 1003 (contracts must be "given their plain meaning" under New York law). Section 11.1 defines force majeure as "an event or circumstance which *prevents* one party from performing its obligations under one or more transactions."[6] We agree with the district court that, contrary to MIECO's contention, "make impossible" is not the only meaning of the term "prevent." *See MIECO LLC v. Pioneer Nat. Res. USA, Inc.*, No. 3:21-CV-1781-B, 2023 WL 2064723, at *6 (N.D. Tex. Feb. 15, 2023). And, as discussed below, the contract's broader context rules out MIECO's interpretation.

The definition cited by MIECO itself in the district court shows why its argument fails. MIECO cited a dictionary entry defining "prevent" as "to render (an intended, possible, or likely action or event) *impractical or impossible* by anticipatory action" *Ibid.* (emphasis added) (quoting Oxford English Dictionary (3d ed. 2007)). Other dictionaries define "prevent" similarly—that is, in a way that does not necessarily connote

---

this argument by failing to raise it until its motion for reconsideration. *See LeClerc v. Webb*, 419 F.3d 405, 412 n.13 (5th Cir. 2005). Even if it was not forfeited, however, the argument would fail. Section 11.5 of the contract provides notice is effective "*from the onset* of the Force Majeure event," which was February 14, 2021.

[6] Similarly, Section 2.19 defines a "Firm" contract as one requiring performance unless "such performance is *prevented* for reasons of Force Majeure."

impossibility. For example, Black's Law Dictionary defines the term simply as "stop from happening; to hinder or impede." *Prevent*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Hinder," in turn, means "to slow or make difficult," "hold back," or "impede, delay, or prevent." *Hinder*, BLACK'S LAW DICTIONARY (11th ed. 2019). Webster's likewise defines "prevent" as "to keep from happening" or "to hold or keep back."[7] Finally, Black's defines a "Force-Majeure Clause" as "[a] contractual provision allocating the risk of loss if performance becomes *impossible or impracticable*." *Force-Majeure Clause*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). So, the district court was correct that the contract's text does not inevitably lead to MIECO's preferred definition of "prevent." *See MIECO*, 2023 WL 2064723, at *6 ("As MIECO's brief acknowledges, MIECO's definition of the word 'prevent' is not the only definition.").

Furthermore, the contract's broader context rules out MIECO's interpretation of "prevent." *See Arista Dev., LLC v. Clearmind Holdings, LLC*, 207 A.D.3d 1127, 1128 (N.Y. App. Div. 2022) ("[A] contract must be read as a whole . . . and single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." (cleaned up)). For example, if "prevent" meant to make performance *impossible*, why would the force majeure clause also require the claiming party to be "unable to overcome or avoid" the event "by exercise of due diligence"? That qualifier would be meaningless because the performance-impeding event would be, by definition, insurmountable.[8]

---

[7] *Prevent*, MERRIAM-WEBSTER ONLINE DICTIONARY, available at https://www.merriam-webster.com/dictionary/prevent?src=search-dict-hed (last visited June 18, 2024).

[8] *See MIECO*, 2023 WL 2064723, at *6 ("Requiring a party to show true impossibility would render portions of the Force Majeure Section superfluous, including the requirement that the claiming party be 'unable to overcome or avoid' the event 'by

Moreover, MIECO's reading would render largely superfluous Section 11.3's list of events *excluded* from force majeure—such as "the ability to sell or purchase gas at a better price." If "prevent" required impossibility, there would be no need to single out such events as not rising to the level of force majeure. *See MIECO*, 2023 WL 2064723, at *6 ("[M]any of the provisions in Section 11.3 that specifically exclude circumstances from force majeure are superfluous under [MIECO's] reading[.]"). *See Lawyers' Fund*, 727 N.E.2d at 566–67 (rendering parts of a contract "superfluous" is "unsupportable under standard principles of contract interpretation").

MIECO's reading would also make the force majeure clause redundant of the common law impossibility defense, as the district court found. *See MIECO*, 2023 WL 2064723, at *6. That defense excuses performance when an event "makes performance objectively impossible." *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987). So, on MIECO's reading, the parties negotiated a force majeure clause with no effect. Indeed, such a clause would paradoxically have *less* effect than common law impossibility because, under New York law, a force majeure clause covers only "specifically include[d]" events in the contract. *Id.* at 296–97. As the district court cogently explained, "[i]f an event not named in the provision made performance impossible, the party could assert a common law impossibility defense but not a force majeure defense." *MIECO*, 2023 WL 2064723, at *6. We agree this is an unreasonable reading of the force majeure clause.

---

exercise of due diligence.'"); *see also LNG Ams., Inc. v. Chevron Nat. Gas*, No. H-21-2226, 2023 WL 2920940, at *8 (S.D. Tex. Apr. 12, 2023) (agreeing with the district court's reasoning on this point).

**2.**

The district court's interpretation gains further support from our decision in *Ergon-West Virginia, Inc. v. Dynegy Marketing & Trade* [*Dynegy*], 706 F.3d 419 (5th Cir. 2013). There, in a similar situation, we interpreted an even stricter force majeure clause not to require impossibility. *Id.* at 424 n.5.

*Dynegy* involved disruptions in gas production and delivery caused by hurricanes Katrina and Rita. *Id.* at 422. Dynegy's suppliers declared force majeure and Dynegy followed suit, forcing Ergon-WV to buy gas on the spot market. *Ibid.* The Ergon-Dynegy contract provided "that a party must be 'rendered unable' to perform 'wholly or in part' by force majeure." *Id.* at 424 n.5. Ergon argued this language did not allow Dynegy to invoke force majeure because Dynegy "had the physical capacity to continue to supply gas to the designated delivery points and could still purchase gas on the spot market." *Ibid.*

We "did not place much weight" on that argument, however, due to the fact that Ergon's "interpretation would make the force majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price." *Ibid. Dynegy*'s reasoning thus counsels strongly against reading "prevent" to mean "make impossible."[9]

---

[9] Two other district courts in this circuit have since followed the district court's approach here and relied on *Dynegy* to interpret the force majeure clause in the NAESB base contract. *See LNG Ams.*, 2023 WL 2920940, at *7–10 (noting the force majeure provisions expressly list "low temperatures which cause freezing or failures of wells"; thus, "[i]f the existence of a spot market precluded force majeure, a well-freezing storm would never qualify unless all suppliers lost virtually all of their production feeding the [] pipeline" and "the force majeure clause would be effectively meaningless"); *Marathon Oil Co. v. Koch Energy Servs., LLC*, No. 4:21-CV-1262, 2023 WL 4032879, at *13 (S.D. Tex. May 8, 2023) (rejecting the argument that "prevent" requires impossibility).

No. 23-10575

MIECO argues *Dynegy* is distinguishable because it interpreted Texas and not New York law. We disagree. While a divergence in states' contract law can sometimes be determinative, *see e.g.*, *Roberts v. Energy Dev. Co.*, 235 F.3d 935, 943–44 (5th Cir. 2000) (noting Texas and Louisiana law conflicted on the permissibility of contractual indemnity agreements), MIECO points us to no difference between Texas and New York law pertinent to this force majeure issue.[10]

**3.**

MIECO cites a smattering of precedents to support its impossibility interpretation. None does.

First is *Aukema v. Chesapeake Appalachia, LLC*, 904 F. Supp. 2d 199, 209–11 (N.D.N.Y. 2012), which held that a government directive prohibiting some oil drilling methods did not trigger force majeure. But that was for two reasons not relevant here. First, the contract did not list a directive as a potential force majeure event, meaning it could not trigger force majeure under New York law. *Ibid.*[11] Second, the parties had foreseen the possibility of such directives and had negotiated a specific remedy. *Id.* at 210. Neither

---

[10] In fact, one of MIECO's key cases, *Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723 (N.J. App. 2014), relied on a Texas court's opinion interpreting a force majeure clause. *See Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 407 n.13 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also infra* III.B.3 (discussing *Hess*).

[11] *See, e.g.*, *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 124 (2d Cir. 2022) (explaining "only if the *force majeure* clause specifically includes the event that actually prevents a party's performance will that party be excused'" (quoting *Kel Kim*, 519 N.E.2d at 296)); *Reade v. Stoneybrook Realty, LLC*, 63 A.D.3d 433, 434 (N.Y. App. Div. 2009) (only listed acts "trigger" a force majeure clause); *see also* Samuel Williston & Richard A. Lord, *Force Majeure Contract Clauses*, 30 WILLISTON ON CONTRACTS § 77:31 (4th ed. 2024) (when the parties "define[] the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure").

rationale pertains to this case, where a "weather related event" like Uri was specifically listed as a force majeure trigger.

True, as MIECO points out, *Aukema* stated that "under force majeure, mere impracticality or unanticipated difficulty is not enough to excuse performance." *Ibid.* (cleaned up). But that statement does not suggest the clause here requires *impossibility*. MIECO also ignores the statement's context. The directive in *Aukema* let defendants use alternate drilling methods, but they argued force majeure still applied because those methods were too costly. *Ibid.* So, again, the court's statement rejecting "impracticality or unanticipated difficulty" as force majeure does not mean force majeure requires performance to be literally impossible.

MIECO's second case, *Rochester Gas & Electric Corp. v. Delta Star, Inc.*, No. 06-CV-6155-CJS-MWP, 2009 WL 368508 (W.D.N.Y. Feb. 13, 2009), is similarly off point. It found no force majeure because (1) the contract did not list as a force majeure event "an increase in price for the steel" and (2) fluctuating steel prices were foreseeable. *Id.* at *7–8, *9. *Rochester* quotes the same "impracticality or difficulty" language as *Aukema*, *id.* at *7, but, again, merely to show that an uncontracted-for event making performance more costly does not qualify as force majeure.[12]

---

[12] The "impracticality" language in *Aukema* and *Rochester Gas* comes from *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989). *See Aukema*, 904 F. Supp. 2d at 210; *Rochester*, 2009 WL 368508, at *7. *Phibro Energy* also does not hold that force majeure requires performance to be impossible. There, the parties argued over whether force majeure was triggered by electrical failures in the seller's plant. *Id.* at 314, 319. The court held that whether the failures constituted an "accident" under the force majeure clause, and whether they were foreseeable, were fact disputes precluding summary judgment. *Id.* at 319–21. Nowhere does the case suggest that a force majeure clause is triggered only where an event renders performance literally impossible.

No. 23-10575

MIECO's third case, *Kel Kim*, 519 N.E.2d 295, actually undermines its argument. There, the New York Court of Appeals separately analyzed common law impossibility and a force majeure clause, treating them as having distinct requirements. *Id.* at 296–97. Much of *Kel Kim* would be unnecessary if, as MIECO argues, New York law treats the force majeure term "prevent" as requiring impossibility. *See id.* at 295–96. And *Kel Kim* said no such thing about force majeure—stating only that the doctrine will excuse performance "only if the *force majeure* clause specifically includes the event that actually prevents a party's performance." *Id.* at 296. Numerous other New York cases have also treated force majeure and impossibility as having distinct requirements.[13]

\* \* \*

In sum, we agree with the district court that the contract term "prevent" does not mean that an event must render performance literally impossible to trigger force majeure.

**B.**

We next turn to MIECO's argument concerning the phrase "Seller's gas supply" in Section 11.3(v). Recall that Section 11.3(v) provides that "the loss or failure of Seller's gas supply" does *not* constitute force majeure—

---

[13] *See A/R Retail LLC v. Hugo Boss Retail, Inc.*, 149 N.Y.S.3d 808, 826–27 (N.Y. Sup. Ct. 2021) (treating impossibility and force majeure as separate doctrines with different requirements); *Gen. Elec. Co. v. Metals Res. Grp. Ltd.*, 293 AD.2d 417, 418 (N.Y. App. Div. 2002) (same); *Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 68 A.D.3d 562, 562 (N.Y. App. Div. 2009) (same). So, even if *Aukema*, *Rochester*, and *Phibro* interpreted New York law to require impossibility in a force majeure clause (which they do not), all are non-binding federal interpretations of New York law. *See Health Net, Inc. v. Wooley*, 534 F.3d 487, 495 (5th Cir. 2008) (a "federal court's interpretation of state law is not binding on state courts and may be discredited at any time" (cleaned up)). Those decisions could not overcome New York courts that consistently treat impossibility and force majeure as distinct doctrines.

*unless* it was caused by one of the events listed in Section 11.2, such as a "weather related event[] affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe." No party disputes that Uri was such an event. But MIECO argues the district court erred by holding that "Seller's gas supply" refers only to the Permian Basin gas Pioneer receives from Targa and not to gas Pioneer might purchase on the spot market. We agree with the district court.

**1.**

Again, start with the words of the contract. *Ellington*, 21 N.E.3d at 1003. The possessive "Seller's" modifies "gas supply"; the "Seller" is Pioneer; and so we must ask what constitutes Pioneer's "gas supply." *See* Antonin Scalia & Bryan Garner, Reading Law 76 (2012) ("Words are to be understood in their ordinary, everyday meanings[.]"). As the district court found, the answer to that question is obvious. *See MIECO*, 2023 WL 2064723, at *2, *8.

We quote at length from the district court's findings on the nature of Pioneer's "gas supply":

> Pioneer, the seller, is a petroleum exploration and production company that produces and sells natural gas. Pioneer's natural gas supply comes from its crude oil extraction operations in the Permian Basin in Texas. As a byproduct of crude oil extraction, Pioneer produces casinghead gas, which Pioneer sends to processing plants. The vast majority goes to one processor, Targa. After Targa processes the casinghead gas, it delivers in-kind residue methane gas and natural gas liquids to Pioneer at the exit point of its processing plants in the Permian Basin. *Pioneer considers this residue gas its "gas supply" for its sales to its customers. If Pioneer experiences shortfalls in its gas supply from Targa and its contractual performance is not excused, Pioneer purchases gas in the "spot market" to cover the shortfall.*

*Id.* at *1 (cleaned up) (emphasis added). This text permits only one conclusion: Pioneer's "'gas supply' is the natural gas it receives from Targa in the Permian Basin." *Id.* at *8.

MIECO's argument that "Seller's gas supply" *also* refers to spot market gas available to Pioneer is not supported by the language of the contract or the facts. "[T]he Contract's use of the possessive 'Seller's' suggests the 'gas supply' is owned or possessed by Pioneer, something which cannot be said of the gas on the spot market." *Ibid.*[14] Furthermore, as the district court found, Pioneer has recourse to the spot market only "[i]f Pioneer experiences shortfalls in its gas supply from Targa." *Id.* at *1. So, it would make no sense to consider spot market gas as a component of Pioneer's own gas supply.

Note, moreover, that Pioneer is a natural gas *producer*, not a middleman who buys from one party to resell to another. A producer's "supply" most naturally refers to its production sources, here the gas Pioneer produces from the Permian Basin. So, we have no occasion to address how the phrase "Seller's gas supply" would apply to a seller who is purely a middleman with no production role. One amicus warns of the interpretive difficulties that could arise in such cases. *See* Brief of Koch Energy Services, L.L.C. & Emera Energy Services, Inc. *et al.*, at 19. Perhaps so, but those cases are not before us. Here, Pioneer produces the vast majority of the gas it supplies from the Permian Basin and so the term most naturally refers to *that* supply. If a contract involved middlemen, possibly the phrase "Seller's gas supply" might have a different connotation. We express no opinion on the issue.

---

[14] *See also LNG Ams.*, 2023 WL 2920940, at *10 (treating "Defendant's gas supply" as the gas it owned "at Katy Oasis").

**2.**

But suppose MIECO is right that the phrase "Seller's gas supply" is ambiguous, at least as to whether it includes spot market gas. That would not change the result, however, because extrinsic evidence confirms that Pioneer's interpretation is the correct one. *See Greenfield*, 780 N.E.2d at 170–71 (explaining courts may use "extrinsic evidence to determine the intent of the parties" if "the agreement is ambiguous"); *Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*, 76 F.4th 341, 350 (5th Cir. 2023) (when a contract is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during [] formation").

To make this point, amici convincingly point to the history of the NAESB base contract. As they explain, the drafting committee has repeatedly rejected amendments in line with MIECO's interpretation. In 2005, for example, the committee rejected a proposal to limit force majeure "to instances where the pooling point operator announced a Force Majeure event"—which would essentially require spot market gas to be unavailable and performance therefore impossible. *See* Brief of Marathon Oil Corp. & Targa Gas Mktg. L.L.C., at 7–8. The next year, the committee rejected arguments that the base contract's force majeure provisions were "overly broad" and imposed a "undefinable level of risk on buyers" because they would "allow a gas supplier ('Seller') to claim that a localized event affecting only a single production facility impedes its ability to perform, even at highly liquid delivery points." Marathon Brief at 8. And after Uri, the committee again rejected proposed amendments seeking to (1) limit force majeure to instances where the gathering hub declared force majeure and (2) define "gas supply" as either the source designated in the transaction confirmation or, if no source was designated, all reasonably available alternative sources of supply. Marathon Brief at 9–11. If "Seller's gas supply" included spot market

gas, then a force majeure declaration would already require what each of these failed amendments sought to achieve.

Furthermore, MIECO's own course of dealing also undermines its interpretation. *See Tyree Org., Ltd. v. Cashin Assocs., P.C.*, 836 N.Y.S.2d 490, 490 (N.Y. Sup. 2007) ("One form of extrinsic evidence is the parties' course of dealing; that is, the practical construction which the parties themselves have placed on the contract.") (table). In 2018, MIECO negotiated a special provision with Counterparty A[15] limiting force majeure to listed events that "directly prevent[] or restrict[] delivery by Seller or receipt by Buyer of Gas at the applicable Delivery Point." MIECO negotiated a similar provision with Counterparty B, amending Section 11.1 to require that force majeure only cover events "preventing the party from making or taking delivery of Gas at the Delivery Point." If MIECO is correct that "Seller's gas supply" includes spot market gas, these provisions would be superfluous. Because gas hubs—which serve as the delivery points for these contracts—receive gas from pipelines and trucks across the country, spot market gas is always available at a delivery point unless the entire country was impacted simultaneously by weather harsh enough to prevent any seller from delivering. So, MIECO's negotiated special provisions show that the unadorned phrase "Seller's gas supply" does not include spot market gas.

### 3.

Turning to precedent, what little exists supports Pioneer. Pioneer relies on the Texas court of appeals' decision in *Virginia Power Energy Marketing, Inc. v. Apache Corp.*, 297 S.W.3d 397 (Tex. App.—Houston [14th Dist.] 2009, pet. Denied), to buttress its view that "Seller's gas supply" refers only to the gas owned by the seller. In that case, Apache failed to

---

[15] The counterparties' identities are confidential under a protective order.

deliver gas to Virginia Power after hurricanes Katrina and Rita. *Id.* at 399. Apache declared force majeure but then turned around and sold gas on the spot market at higher prices—some of which Virginia Power ended up purchasing. *Id.* at 401, 407.

The parties sparred over the meaning of "gas supply" in Section 11.3 of the NAESB contract. *Id.* at 405. While Apache argued the term referred only to gas from "specific . . . platforms" earmarked for the contract, Virginia Power contended it included "Apache's uncommitted gas" which it could have used to fulfill the contract. *Ibid.* Agreeing with Virginia Power, the court held that "the plain and ordinary meaning of 'gas supply' as used in the [NAESB] Contract, refers to the amount or quantity of [Apache's] gas that was available to satisfy [Virginia Power's] contractual demands." *Id.* at 407 (emphasis omitted).[16] So, *Virginia Power* interpreted "Seller's gas supply" to embrace only gas the seller owned and could physically deliver to the buyer—not spot market gas.[17]

---

[16] The court remanded because fact disputes remained over whether the hurricanes caused failure of Apache's "gas supply," understood in that broader sense. *Id.* at 407–08.

[17] District courts in our circuit have adopted a similar interpretation. *See, e.g.*, *Canadian Breaks LLC v. JPMorgan Chase Bank, N.A.*, No. 2:21-cv-00037-M, 2024 WL 1337868, at *3 (N.D. Tex. Mar. 28, 2024) (holding "Seller's supply . . . refers to the energy that is generated at the relevant [production sources]" and not that which is procured from third parties); *Unit Petrol. Co. v. Koch Energy Servs., LLC*, No. 4:21-CV-01260, 2023 WL 4828375, at *1 (S.D. Tex. July 27, 2023) (treating "gas supply" as that produced by the seller, not gas on the spot market); *Targa Gas Mktg. LLC v. Koch Energy Servs., LLC*, H-21-1258, 2024 WL 1076839, *1 (S.D. Tex. Feb. 20, 2024) (treating defendant's "gas supply" as gas it processed, not spot market gas).

Other courts outside our circuit have also interpreted "Seller's gas supply" as only covering gas that the seller owns. *See CF Indus., Inc. v. Transcon. Gas Pipe Line Corp.*, 614 F.2d 33, 34–35 (4th Cir. 1980) (treating "gas supply" as appellee's sources of natural gas from its wells); *Ark. Okla. Gas Corp. v. BP Energy Co.*, No. 2:21-cv-2073, 2023 WL 3620746, at *10 n.13 (W.D. Ark. May 24, 2023) (differentiating between the "loss of a seller's supply from its own production facilities" and gas from "third-party facilities").

No. 23-10575

MIECO relies principally on *Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723 (N.J. App. 2014).[18] There, the gas seller, ENI, declared force majeure when a leak disabled its Independence Trail Pipeline in the Gulf of Mexico. *Id.* at 725–26. The buyer, Hess, had to buy costlier gas on the spot market and sued. *Id.* at 726. Affirming the district court, the appeals court held that the force majeure clause did not excuse ENI's non-performance. *Id.* at 728–29. The contract did not limit ENI's "gas supply" only to gas transported through the Independence Trail Pipeline and, moreover, ENI admitted it had other production sources in the Gulf not affected by the leak. *Id.* at 726 n.7, 728.

*Hess* does not support MIECO's argument that "Seller's gas supply" includes spot market gas. First of all, *Hess* relied extensively on *Virginia Power*. *See id.* at 728–29. As discussed, that decision treated the seller's "gas supply" as gas the seller owned, not gas the seller could obtain from third parties. *See Virginia Power*, 297 S.W.3d at 407. Moreover, *Hess* (also like *Virginia Power*) addressed whether the contract limited the relevant "gas supply" to earmarked sources—such as a particular transportation pipeline. *See Hess*, 86 A.3d at 727–28 (noting the contract did "not identify a specific transporter . . . or a specific pipeline"). No party even argued that the seller's "gas supply" included spot market gas. Indeed, *Hess* explicitly

---

[18] MIECO also relies on *J.P. Morgan Ventures Energy Corp. v. Mia. Wind I, LLC*, 179 N.Y.S.3d 892, 892 (N.Y. Sup. Ct. 2022) (table), where owners of Texas windfarms declared force majeure following Uri to excuse their failure to deliver electricity. A New York court held the force majeure clause was not triggered by the owners' "inability to generate electricity at their respective windfarms during the storm," because the clause categorically *excluded* "the loss or failure of Seller's supply." *Ibid.* The decision does not support MIECO's argument because it treated the "Seller's supply" as the electricity generated at the owners' own windfarms.

No. 23-10575

distinguished the seller's own "sources of gas" from gas available on the "spot-market." *Id.* at 728.

\* \* \*

In sum, we agree with the district court that "Seller's gas supply" in Section 11.3(v) refers to the Permian Basin gas Pioneer produced and processed through Targa, not to gas available on the spot market.[19]

## C.

Finally, we turn to MIECO's argument that genuine disputes of material fact remain, precluding summary judgment. Because this argument concerns components of the contract's force majeure definition, we repeat the relevant parts here.

Section 11.1 defines force majeure as

---

[19] Amici on both sides argue that the other side's interpretation of the NAESB base contract will upset oil-and-gas markets. For example, MIECO and supporting amici argue that it undermines the whole purpose of a "Firm" obligation to interpret the contract to let a seller declare force majeure when an event impacts its internally earmarked source of gas. *See* Brief of Professor Joseph A. Schremmer, at 6–12; Brief of Clayton Energy, Inc. & United Energy Trading, L.L.C., at 6–11. They also predict that sellers will be emboldened to declare force majeure and then turn around and sell previously committed gas on the spot market for inflated prices. Brief of CPS Energy, at 6; Koch Energy Brief at 27–28. Pioneer and its supporting amici, on the other hand, contend that interpreting the contract to require sellers to purchase spot market gas during a force majeure event defies industry practice and would upset current risk allocations. Brief of Texas Oil & Gas Ass'n, at 8–10; Brief of Permian Basin Petroleum Ass'n, at 16–17. They also warn that such an interpretation would exacerbate already severe inflationary pressures by causing more parties to compete for limited spot market gas. Marathon Brief at 12–17.

We recognize that the NAESB contract is used nationwide by oil and gas producers, traders, and purchasers. Schremmer Brief at 1, Koch Energy Brief at 2, 8, 19. Our decision, however, is not charted by our own guesses or predictions about how those markets operate. Rather, we decide this case according to these specific facts and contractual language. We do not pretend to resolve how the NAESB contract would apply to scenarios not before us today.

an event or circumstance which *prevents* one party from performing its obligations under one or more transactions . . . which, *by the exercise of due diligence*, the claiming party is unable to *overcome or avoid* or cause to be avoided, *as further defined in Section 11.2.*

Section 11.2 then lists the triggering force majeure events (including the weather-related event applicable here) and concludes that

Seller and Buyer *shall make reasonable efforts to avoid the adverse impacts of a Force Majeure* and to resolve the event or occurrence once it has occurred in order to resume performance.

Based on these provisions, MIECO argues the district court failed to make two necessary fact findings—namely, whether (1) Uri "prevented" performance and (2) whether Pioneer exercised "due diligence" to "overcome or avoid" Uri's effects or made "reasonable efforts" to "avoid" Uri's impacts.[20] As explained below, we agree with MIECO and therefore remand for the district court to make those findings.

**1.**

Initially, Pioneer claims MIECO forfeited these arguments by failing to raise them in its opposition to summary judgment. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397–98 (5th Cir. 2021). We disagree.

In its opposition, MIECO sufficiently raised each fact issue it now argues on appeal. First, it argued that Uri, "as severe as it was, in no way prevented Pioneer from making good on its contractual obligation" because (1) the delivery point was "900 miles away" from the impacted area;

---

[20] MIECO also argues that what constitutes Pioneer's "gas supply" is a fact issue. We disagree. It is a legal issue. *Ames v. County of Monroe*, 162 A.D.3d 1724, 1726–27 (N.Y. 2018) (holding that interpretation of contractual terms is a legal question).

(2) "[t]hroughout the period at issue in this lawsuit . . . there were ample supplies of gas available at the Arizona-California border for purchase by Pioneer to make up for any shortfall of deliveries from the Targa plants"; and (3) Pioneer "routinely purchased gas on the spot market when deliveries from Targa fell short."

Second, and closely related to its first argument, MIECO contended that Pioneer may have been obligated to purchase replacement gas under Section 11.1's due diligence requirement. MIECO asserted that "whatever impacts Winter Storm Uri may have had on Pioneer . . . by the exercise of due diligence, [it] could have overcome . . . [Uri's] impacts by purchasing gas that was widely available for delivery at the Arizona-California interconnections with the SoCalGas system." According to MIECO, "Pioneer did not even try to purchase gas for delivery to MIECO" and allegedly "admits it made no efforts to purchase gas after February 12, 2021." MIECO contends this evidence demonstrates that "Pioneer—knowing that someone would have to purchase replacement gas—sought to foist the increased cost of replacement gas on MIECO" by sitting on its hands.

MIECO also pointed out the link between Section 11.1 (the "due diligence" language) and Section 11.2 (the "reasonable efforts" language). MIECO quoted the contract language that "Force Majeure is 'further defined' by Section 11.2" and argued that, therefore, "everything in Section 11.2" and 11.1 are linked. To be sure, MIECO did not explicitly reference the "reasonable efforts" language in its opposition. But the contract

explicitly links Section 11.1 and 11.2. So, invoking Section 11.1 was sufficient to preserve the Section 11.2 reasonable efforts argument on appeal.[21]

Accordingly, MIECO's summary judgment opposition sufficiently preserved the arguments MIECO now presses on appeal. *See, e.g.*, *Dall. Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148, 156–57 (5th Cir. 2013) (an "argument must be raised [at summary judgment] to such a degree that the district court has an opportunity to rule on it" (citation omitted)); *see also United States v. Rosenthal*, 805 F.3d 523, 528 (5th Cir. 2015) (same).

**2.**

We proceed to MIECO's argument. As discussed, *supra* III.A, the district court correctly held that a force majeure event need not render performance impossible to "prevent" it. But the court granted summary judgment without proceeding any further in the analysis. We agree with MIECO that this was error.

To begin with, the court did not make any findings as to whether Uri in fact prevented Pioneer's performance. This is a fact issue the parties vigorously contested at summary judgment. For instance, the parties disputed whether Pioneer could have fulfilled its contractual commitments with "other sources of gas" such as "counterparties with whom it has NAESB Base Contracts in place and from whom it regularly purchases gas." They also disputed whether Pioneer could have purchased available spot

---

[21] The district court evidently did not consider MIECO's arguments on these points because (1) it made no findings as to Pioneer's "due diligence" and (2) it thought MIECO first raised the "reasonable efforts" argument in its motion for reconsideration. As discussed, though, MIECO sufficiently raised these arguments in opposition to summary judgment.

market gas that was allegedly available in sufficient quantities at the delivery point, as Pioneer seems to have done in the past.

The court also made no findings on whether Pioneer exercised "due diligence" by making "reasonable efforts" to avoid Uri's adverse impacts. It stated only that "[r]equiring a party to show true impossibility would render portions of the Force Majeure Section superfluous, including the requirement that the claiming party be 'unable to overcome or avoid' the event 'by exercise of due diligence.'" *MIECO*, 2023 WL 2064723, at *6. While that is true, it tells us nothing about whether Pioneer actually exercised due diligence to avoid Uri's disruptive effects. And MIECO strenuously disputed Pioneer's due diligence at summary judgment.[22]

Resolving these disputed matters was necessary to decide whether Pioneer properly invoked the force majeure clause. Our *Dynegy* decision is instructive. One of the contracts at issue there defined force majeure as an event outside the parties' control "*which by the exercise of due diligence such party is unable to prevent or overcome.*" 706 F.3d at 425–26.[23] After a bench trial, the district court ruled this language unambiguously required the supplier to purchase spot market gas and, so, granted the buyer summary judgment. *Id.* at 422. We reversed. Finding the clause ambiguous, we

---

[22] For example, MIECO argues Pioneer failed to exercise due diligence because, following Uri, it merely waited for Targa to produce more gas. But all the while, MIECO argues, "there was ample gas for Pioneer to purchase at Ehrenberg" through "a simple process that could be accomplished in seconds using an electronic exchange." In other words, the cause of Pioneer's failure to perform, MIECO claims, was not Uri but rather Pioneer's choice to avoid the expense of purchasing more costly gas. We express no opinion on any of these disputes, leaving them to the district court's fact finding on remand.

[23] Another contract in *Dynegy* required the parties to remedy any force majeure event with "all reasonable dispatch." *Id.* at 422–23. Finding that clause ambiguous, the court relied on extrinsic evidence to find the seller had no duty to purchase spot market gas. *Ibid.*

reviewed extrinsic evidence from the bench trial and concluded the supplier had no duty to purchase spot market gas under the clause. *See id.* at 426 (concluding "the gas industry evidence . . . counsels that [] the supplier had no such duty [to purchase spot market gas]").

In this case, as discussed, there are genuine fact disputes over whether Uri actually prevented Pioneer's performance and, relatedly, whether Pioneer made reasonable efforts to overcome Uri's effects. The district court, however, made no findings on these matters but instead decided the case on summary judgment. That was error. Whether the force majeure clause excused Pioneer's non-performance turns on those factual issues. *See id.* at 426, 423 (relying on "trade usage" evidence to determine whether seller had a duty to purchase spot market gas).[24] The proper remedy is to remand to the district court for fact finding on those matters.[25]

Pioneer's counterarguments are unconvincing. It contends that whether it was impractical for Pioneer to purchase replacement gas is "legally irrelevant" because its "delivery obligation was completely excused when it lost its gas supply due to Uri." We disagree. Pioneer's interpretation would edit out of the contract Section 11.1's mandate that the claiming party

---

[24] *See also, e.g.*, *LNG Ams.*, 2023 WL 2920940, at *7–10 (to determine whether Uri "prevented" performance, analyzing alternative fuel sources, the relative cost of purchasing replacement gas, and expert testimony concerning industry customs).

[25] *See Jones v. Givens*, No. 19-50465, 2021 WL 3889295, at *4 n.5 (5th Cir. Aug. 30, 2021) ("'The district court did not address this issue, and we decline to do so in the first instance,' particularly because of the scant record before us." (quoting *Harrison v. Quarterman*, 496 F.3d 419, 429 (5th Cir. 2007))); *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 596 (5th Cir. 2003) ("The district court should consider these arguments including any factual issues necessary to resolve them in the first instance."); *Hill v. New Orleans City*, 643 F. App'x 332, 338 (5th Cir. 2016) ("A 'more efficient alternative' to 'combing through the record ourselves and concluding what factual scenario the district court likely assumed' is often to 'remand to the district court . . [.]'" (quoting *Castillo v. City of Welasco*, 369 F.3d 504, 507 (5th Cir. 2004))).

exercise "due diligence" as well as Section 11.2's "reasonable efforts" requirement. Such an interpretation is therefore unreasonable under New York law. *See Lawyers' Fund*, 727 N.E.2d at 566–67 (rendering parts of a contract "superfluous" is "unsupportable under standard principles of contract interpretation").

Pioneer also argues that the duty of "due diligence" applies only to overcoming the force majeure event *itself*—Winter Storm Uri—but not the event's downstream effects. All Pioneer could do to overcome the storm, it argues, was to promptly restore its gas supply—which it did. But Pioneer's argument is refuted by Section 11.2's text. It requires the parties to "make reasonable efforts *to avoid the adverse impacts* of a Force Majeure *and* to resolve the event or occurrence once it has occurred *in order to resume performance*." Those are two independent requirements, but Pioneer's argument would collapse them into one.

In sum, MIECO is correct that genuine disputes of material fact exist whether (1) performance was actually prevented, and (2) Pioneer exercised due diligence by making reasonable efforts to avoid Uri's adverse impacts. Summary judgment was therefore improper.

## IV. Conclusion

The district court correctly interpreted the force majeure clause in the Pioneer-MIECO contract. But fact disputes remain as to whether Pioneer exercised reasonable efforts to avoid Winter Storm Uri's impact on its ability to perform under the contract. We express no opinion on those disputes and leave their resolution up to the Parties and the district court on remand.

Accordingly, the district court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.